Argued and submitted September 13, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings December 16, 2010

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## LUIS ALBERTO SALAS-JUAREZ,
*Petitioner on Review.*

(CC 063530FE; CA A135010; SC S058190)

245 P3d 113

Brian Patrick Conry, Portland, argued the cause and filed the brief for petitioner on review.

Joanna L. Jenkins, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief was John R. Kroger, Attorney General.

GILLETTE, J.

**GILLETTE, J.**

The issue in this criminal case is whether the trial court erred in refusing to allow the jury to hear that a participant in a knife fight that led to murder charges against defendant had made a threatening statement, earlier in the evening, about wishing to "slash" someone. After a jury convicted defendant of murder and attempted murder, he appealed, assigning error to the trial court's ruling excluding that statement. The Court of Appeals affirmed defendant's convictions without opinion. *State v. Salas-Juarez*, 230 Or App 580, 217 P3d 264 (2009). We allowed defendant's petition for review, and now reverse the judgment of the trial court and the decision of the Court of Appeals.

In the early hours of August 13, 2006, defendant and another man, Russell, engaged in a fight on a street in Medford with a group of eight people. During that fight, one member of the group, Mark Lunsford, was fatally stabbed. All participants in the fight admitted to having been drunk, and each described the events from his or her own perspective. Nonetheless, a picture of what happened that evening eventually emerged. According to Russell, the group first had crossed paths with him around 2:35 a.m. and had shouted racist slogans at him, implying that Russell was himself a racist. Russell exchanged words with the group, but all parties continued walking. A few minutes later, Russell encountered defendant, a Hispanic man, walking in a direction that would cause him to encounter the group. Russell stopped defendant and told him that there were "racist people" nearby. The content of the rest of Russell's conversation with defendant is in dispute, but it is undisputed that defendant and Russell soon approached the group and verbally confronted them. Defendant, who was wearing a light colored long-sleeved shirt over a sleeveless white tank top, took off the outer shirt, removed his belt and began swinging the belt around. One of the members of the victim's group, Taylor, also took off his belt and began to swing it around. Russell then pulled out a knife and began lunging with it.

A number of witnesses testified that, within moments of the start of the fight, defendant stabbed Lunsford and chased another of the group, Crowley, lunging

at him with a knife. Crowley testified that he was able to avoid being stabbed by defendant and eventually punched defendant in the side of the head, knocking him down. Another member of the group, Barnett, testified that he threw a rock at defendant's head to distract him from Crowley, although he was not sure whether he had hit defendant with it. In any event, by that time, someone had called for police assistance and the authorities were on their way. Defendant ran away, with two other members of the victim's group—Thomas Lunsford (the victim's brother) and Ricks—pursuing him through the streets of Medford. Police officers had responded to the emergency call, and defendant ran directly toward them. Thomas Lunsford, on seeing the officers, put his head down and turned to walk in a different direction. The officers took both defendant and Thomas Lunsford into custody.

Meanwhile, Russell had run off in another direction. His identity was not known to defendant, the victim's group, or the police. All of the participants in the fight described the second instigator (Russell) as a white "punk rock guy" with a shaved head, wearing a black t-shirt with a punk rock band logo on it.

After the stabbing, the victim's friends flagged down a car that was passing by. The driver of that car, Vissar, happened to be a member of a punk rock band that had been playing in the night club where Russell had spent the evening before the fight. The police eventually described the second instigator to Vissar, who thought that the second instigator was Russell. Vissar remembered Russell because Russell had been dancing by himself in a conspicuous manner close to the stage during the performance and also had engaged a couple of the band members in conversation. One of the band members remembered Russell's first name; another mentioned the name of a band in which Russell had played. With those leads, the police were able to track Russell down within a few days after the fight.

While the police were interviewing the band members to discover Russell's identity, one member of the band, Stewart, told the officers about a statement that Russell had made at the club regarding the bartender's son, a person who

had no involvement with the later events. The bartender's son was extremely drunk and belligerent, and was picking fights with various people over the course of the evening. At one point, Stewart saw the bartender's son and Russell bump shoulders and exchange glares; the two did not, however, engage in any actual fight or lengthy verbal exchange. Later, when the band was taking a break, Russell sat down at a table with Stewart and began making conversation, complimenting him on the music. Russell mentioned the incident with the bartender's son. Stewart responded by asking Russell, "Well, did you just tell him to go [perform an unlikely sexual act]?" Stewart stated that Russell replied that the bartender's son "was really starting to irritate him and piss him off, and he wanted to slash him." When Russell made that statement, Russell lifted his shirt and showed Stewart a knife, which Stewart described as a black "Rambo-style" fixed-blade knife, about six to seven inches in total length, in a sheath attached to his belt.

Immediately after the fight, the police conducted a thorough search of the entire area to locate the knife that had been used in the stabbing. The officers scoured the area where the fight took place and retraced the path that defendant had taken when he ran from the scene. They used a metal detector to search the ground, and even searched the roof of a nearby building, but did not find a knife. They did, however, find defendant's shirt, parts of defendant's belt and belt buckle, Taylor's belt and belt buckle, and a large rock such as Barnett described throwing.

Several days later, the police learned Russell's identity and contacted him. Russell initially declined to talk to the officers; eventually, however, officers were able to interview him. Russell told them about the events leading up to the fight. His story to that point was consistent with the other witnesses' descriptions of the events. In describing the fight, Russell admitted that he had had a knife and that he pulled it out and waved it around. He stated that someone punched him on the side of the head and knocked him down. While he was falling or when he was on the ground, something—which Russell surmised to be a rock—landed on the ground nearby. He stood up, heard someone yell, "He's been stabbed," and ran away. He stated that he did not stab anyone with his

knife. He also stated that he did not see defendant wield a knife, nor did he see defendant stab anyone.

Officers obtained a warrant to search Russell's home. During the search, they found, among other things, a t-shirt and shorts that appeared to be those that Russell had been wearing on the night of the fight, together with a folding knife with a black handle. The items were folded neatly and placed together in a drawer. The clothes had not been washed. Testing later revealed that Russell's own blood was on his shorts, but none of the victim's blood was found on any of Russell's clothing or on the knife. Russell later identified the knife as the one that he had used in the fight. He testified that the knife was clipped to the inside of his pocket, and that he removed it and opened it during the fight.

Defendant was charged with the murder of Mark Lunsford and with the attempted murder of Crowley. At the trial, defendant's theory of the case was that the witnesses were mistaken in identifying defendant as the stabber, and that Russell was the person who had stabbed Mark Lunsford and tried to stab Crowley. The parties agreed that evidence concerning how Russell was identified as the second individual involved in the fight that night was relevant. The parties also agreed that the fact that Russell was seen with a knife earlier in the evening of the fight was relevant. Thus, the state informed the court that it intended to present the testimony of the band members to explain how they had helped to lead the police to Russell and to establish that Russell had a knife, and that Russell also would be called to testify.

Defendant also wanted to offer Russell's statement about wanting to "slash" the bartender's son. Defendant contended that that statement was admissible under OEC 404(3) to show Russell's motive or intent to kill Mark Lunsford.[1] The state opposed admission of the statement. The trial court ultimately ruled that the statement did not

---

[1] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

show motive or intent to kill Lunsford, and therefore was not admissible.

During the trial, two band members testified about remembering Russell at the club that night, describing his enthusiastic dancing in front of the stage and his apparent enjoyment of the music. Both band members stated that Russell appeared to be having a good time. In compliance with the trial court's earlier ruling, the witnesses were not asked and did not testify about the incident with the bartender's son or Russell's statement. Stewart did testify that Russell

> "had a knife on his side that he decided to like flash me. * * * He just picked his shirt up like that and drop[ped] it like that."

Stewart then went on to describe the knife.

After the state completed its direct examination of Stewart, defense counsel argued outside the presence of the jury that defendant should be entitled to impeach Stewart by bringing up the incident with the bartender's son. He argued that the defense had never heard before that moment that Russell appeared to be having fun at the bar, and that he should be permitted to impeach the statement that Russell was having fun with the fact that, in that context, Russell had gotten into a confrontation with the bartender's son and had said that he wanted to "slash" him. The trial court observed that it could not actually be a surprise to anyone that Russell was having a good time at the bar and ruled that it was "not proper impeachment."

The trial progressed. Among other things, the state presented the testimony of several of the individuals who had been with the victim at the time of the stabbing who testified that they saw defendant stab Mark Lunsford, and that, after initially behaving aggressively, Russell just stood to the side while the fight was taking place. Through cross-examination, defense counsel was able to draw out the following facts, among others, in support of defendant's theory of the case:

• Although Crowley remembered punching defendant in the side of the head and Barnett remembered throwing a rock at him, defendant did not appear to be injured when

he was arrested. Moreover, although Russell testified that, in the course of the brawl, he had been punched in the side of the head, that an object had hit the ground near him and he had surmised that a rock had been thrown at him, and that he had been injured, none of the members of the victims' group remembered fighting with Russell.

- Although Barnett testified at the trial that he saw defendant stab Lunsford, he initially told the police that Russell was the person with the knife and the person who had stabbed the victim.

- Although Thomas Lunsford, the victim's brother, testified at trial that he saw defendant stab the victim, he initially told a police officer that he had been walking in front of the rest of the group before the fight occurred, that he had heard someone yell from behind him that his brother had been stabbed, and that he rushed back to the group and found his brother bleeding.

- None of the victim's blood was found on defendant's clothing.

- The state presented witnesses who testified that, two weeks before the fight, defendant bought a knife with a sheath depicting the Mexican flag and that he wore it on his belt all the time. No such knife ever was found, despite an exhaustive search. The sheath was not found either, notwithstanding the fact that defendant's belt and belt buckle were found at the location of the fight.

- Russell admitted to a friend the day after the fight that he "may have" stabbed someone during the fight, although he was not sure.

At the conclusion of the state's case, defendant moved for judgment of acquittal, arguing that the state's evidence did not prove beyond a reasonable doubt that defendant committed the charged offenses. The trial court denied the motion. Ultimately, the jury found defendant guilty of the murder of Mark Lunsford and of the attempted murder of Crowley. Defendant appealed his convictions to the Court of Appeals, which, as noted, affirmed without opinion.

On review in this court, defendant argues that the trial court erred in excluding the evidence that Russell had stated, earlier on the evening of the stabbing, that he wanted

to "slash" the bartender's son. Defendant's argument is two-fold: He contends that Russell's statement about wanting to slash the bartender's son shows that, earlier in the evening, Russell was in an angry mood resulting from his confrontation with the bartender's son, and his manifestation of that anger was a desire to resort to his knife. That, according to defendant, explains why Russell later instigated a fight against eight other people, and amounts to a "motive" to use the knife on someone else less than an hour and a half later. For that reason, he argues, the statement is relevant and admissible under OEC 404(3). In addition, defendant argues that the statement about being "irritated" and "pissed off" and wanting to slash the bartender's son flies in the face of Russell's testimony, and that of band members Stewart and Vissar, that Russell was in a happy, "mellow" mood when he was at the club before the fight. Therefore, defendant asserts, he should have been permitted, under OEC 613, to use Russell's prior inconsistent statement to impeach the testimony of Stewart, Vissar, and Russell that Russell was having fun at the club.[2]

■     We begin at the beginning. As noted, defendant informed the court in a pretrial hearing that he intended to offer evidence that Russell had stated that he wanted to "slash" the bartender's son. Under OEC 402, that evidence was admissible if it was relevant and not excluded by Oregon evidence rules, by Oregon statutory and decisional law consistent with those rules, or by constitutional considerations.[3] The first question, then, is whether that evidence was relevant.

■     As we have often stated, the threshold for admission of evidence on grounds of relevance is low: "[E]vidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Barone*, 329 Or 210,

---

[2] Defendant also makes various constitutional arguments that he did not raise in the trial court. We do not consider those unpreserved arguments in this opinion.

[3] OEC 402 provides:

"All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon, or by Oregon statutory and decisional law. Evidence which is not relevant is not admissible."

238, 986 P2d 5 (1999); *accord State v. Hampton,* 317 Or 251, 255, 855 P2d 621 (1993); OEC 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Indeed, in considering that matter, the inference that the proponent of the evidence wishes to be drawn from the evidence need not be the necessary, or even the most probable, one. *Hampton,* 317 Or at 255 n 8.

Thus, the question is whether Russell's statement increased, even slightly, the probability that Russell was the person who stabbed Mark Lunsford. Russell responded to an altercation with the bartender's son by stating he wanted to "slash" that individual. Stewart testified in the offer of proof that he took Russell's statement seriously enough to alert the bartender, who then sent her son home in a taxi. One inference that the jury was entitled to draw from Russell's reaction to the seemingly minor altercation with the bartender's son was that Russell was in an angry frame of mind on the night in question. That may not be the only inference that could be drawn, given the other evidence of Russell's behavior at the club, but it is a permissible one. Russell's statement, therefore, was at least some evidence of his general state of mind at the time that he made the statement.

That evidence then must be considered together with the evidence that, an hour and a half later, Russell recruited defendant to confront the victim and his friends and instigated the fight with them. From Russell's later actions, the jury further reasonably could infer that Russell's state of mind was an ongoing one. Put another way, the jury reasonably could conclude that Russell's general state of mind on the night in question was such that, when he was offended, he would respond in anger and with a willingness to "slash" his offender.

Those inferences, in turn, would make it more probable that Russell slashed at Mark Lunsford with his knife and less probable that Russell simply stood by while defendant and the victim's friends were engaged in the fight, as Russell later claimed. So viewed, the evidence of Russell's expressed state of mind was relevant to the central dispute

in the case: Which person—defendant or Russell—stabbed Mark Lunsford?

■     The evidence being relevant, it was admissible unless excluded by some other rule, law, or case. OEC 402. As discussed above, defendant claimed that Russell's statement was admissible under OEC 404(3), while the state claimed that it was not. That rule provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Although defendant, in his argument to the trial court, implicitly conceded that Russell's statement about wanting to slash the bartender's son was a "wrong" or an "act" under OEC 404(3), we do not find it necessary to resolve that issue. Instead, we shall assume that the statement was an "act" within the meaning of OEC 404(3), and concern ourselves with whether evidence of that "act" was nonetheless admissible under the rule. *See State v. Hayward*, 327 Or 397, 409, 963 P2d 667 (1998) (using such an approach). We conclude that it was. Defendant's trial strategy, as we understand it, was to create a reasonable doubt as to his own guilt by suggesting to the jury that Russell was the perpetrator. As we have explained, evidence of Russell's state of mind would permit the jury to conclude, through a short series of inferences, that Russell stabbed Mark Lunsford. The evidence of Russell's state of mind thus not only was relevant, it was critical to defendant's case.

In arguing to the contrary, the state acknowledges that evidence tending to show that Russell was "in an angry mood" or had a generalized desire to engage in violence would be relevant to establish a motive to engage in violence a short time later. But what the state fails to acknowledge, and what we think is clear, is that Russell's statement about wanting to "slash" the bartender's son an hour and a half before *was* such evidence. That is, it was evidence from which the jury reasonably could infer that Russell was generally in an angry or violence-prone mood—especially when it is coupled with

his later behavior in instigating the fight with the victim and the victim's friends and recruiting defendant to join him in that fight.

■     The remaining question is whether any error in excluding the statement was harmless. The state argues that the tenuous relevance of the statement to defendant's case was rendered negligible by other evidence. In particular, the state relies on the fact that defendant admitted that he agreed to go with Russell to confront the victims, he admitted to provocative words and deeds with respect to the victim's group, and multiple other witnesses identified defendant as one of the two instigators of the fight. The state also emphasizes that the jury heard far more relevant and specific evidence of Russell's motive with respect to the particular victims in the case. For example, Russell admitted that he was intoxicated the night of the fight. He admitted that, immediately before the fight, he engaged in a provocative and heated verbal exchange with the group, which involved accusations of racism. He admitted that he was sufficiently provoked by that encounter that he stopped defendant on the street, described the group as racists, and essentially recruited defendant to confront them. The jury also heard evidence that Russell (and defendant) ran at the group, shouting obscene insults and provoking a fight. Russell himself testified that he was involved in the fight and that he pulled out his knife and poked at people with it. The state argues that, given those circumstances immediately surrounding the fatal fight, whether Russell had a prior, generalized angry state of mind sheds little light on the question of who stabbed Mark Lunsford. That is, once Russell and defendant were in the heat of the battle, Russell's previously expressed desire to "slash" the bartender's son was of little probative value in determining who in fact stabbed the victim.

We think that that argument points precisely the other way. The evidence against defendant, while significant, was not overwhelming. Given the evidence that pointed to Russell as the actual perpetrator, we cannot conclude that the additional evidence of Russell's statement, which suggested an angry state of mind, would not have tipped the balance toward a reasonable doubt as to defendant's guilt. The jury could, for example, reasonably have inferred that the

angry state of mind that Russell's statement suggested persisted over the next hour and a half, and that it therefore was unlikely that Russell would have "stood by," as he claimed he did, once the fight began in earnest. Reasonable doubt may be built upon such a foundation of fact and inference. The jury should have heard about the statement; its exclusion was not harmless.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.