Filed: November 8, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Respondent on Review,

v.

DEVIN S. LEWIS,

Petitioner on Review.

(CC CR090164; CA A144772; SC S059739)

On review from the Court of Appeals.*

Argued and submitted June 13, 2012.

Jona J. Maukonen, Harrang, Long, Gary, Rudnick, P.C., Portland, argued the cause and filed the briefs for petitioner on review. With her on the briefs were James E. Mountain, Jr., and Sivhwa Go, Portland.

Andrew M. Lavin, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Balmer, Chief Justice, and Durham, De Muniz, Kistler, Walters, and Linder, Justices.**

LINDER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

*Appeal from Yamhill County Circuit Court, John L. Collins, Judge. 244 Or App 693, 258 P3d 538 (2011).

**Landau, J., did not participate in the consideration or decision of this case.

LINDER, J.

This case requires us to examine the legal standard for the mental state of criminal negligence and to assess, when tested by that standard, whether the record in this case is sufficient to support defendant's conviction of criminally negligent homicide. Defendant, while driving a tractor-trailer truck, collided with the victim's catering truck from the rear. The collision pushed the victim's truck into the oncoming lane of traffic, where it was struck by a logging truck. The victim died at the scene. The state charged defendant with criminally negligent homicide. ORS 163.145(1).[1] Before trial, defendant moved to suppress evidence of the manner in which he had been driving 10 to 15 minutes before the collision. The trial court denied the motion. Defendant then waived his right to a jury and proceeded with a bench trial. At the close of the state's case, defendant moved for a judgment of acquittal, which the court denied. The trial court subsequently

---

[1] ORS 163.145(1) provides:

"A person commits the crime of criminally negligent homicide when, with criminal negligence, the person causes the death of another person."

ORS 161.085(10) provides:

"'Criminal negligence' or 'criminally negligent,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

1

convicted defendant.  Defendant appealed, and the Court of Appeals affirmed without opinion. *State v. Lewis*, 244 Or App 693, 258 P3d 538 (2011).  For the reasons set out below, we affirm.

We begin with the pertinent facts, some of which we discuss in additional detail later in our opinion.  In describing the facts, we state them in the light most favorable to the state.  *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007).

Defendant, a licensed commercial truck driver, was driving an empty tractor and trailer westbound on Highway 18 in Yamhill County.  The victim, also traveling westbound, was driving a heavily loaded catering truck (a converted pickup) and had stopped in the westbound lane, ahead of defendant, to make a left turn onto Christensen Road.  In that area, Highway 18 consists of one lane in each direction.  The Oregon Department of Transportation has designated the segment of Highway 18 where the collision occurred as a "safety corridor," meaning it has a higher than normal crash rate, which has prompted officials to take special measures (*e.g.*, enhanced fines and larger signage) to encourage more cautious and safe driving.  The day was overcast, and the road was wet, but visibility was good.

As the catering truck approached the intersection with Christensen Road, it rolled to a slow, controlled stop.  Two logging trucks approached from the opposite direction, traveling eastbound.  The driver of the first logging truck, Gedenberg, saw the catering truck slow and come to a full stop at the intersection, with its left front turn signal blinking.  Gedenberg, who was traveling about 45 miles per hour, passed the fully stopped catering truck as he went through the intersection.  Throughout the drive that

morning, Gedenberg had been conversing by CB radio with Olsen, the driver of the second logging truck. Gedenberg immediately warned Olsen about the catering truck, concerned that the driver would try to make the turn after Gedenberg passed him, in front of Olsen.

As Gedenberg drove past the catering truck, he saw defendant's truck ahead, traveling towards the still stopped catering truck. Gedenberg testified that he could see defendant for approximately five seconds before their trucks passed and that defendant, during that time, was looking down at his feet or lap and not at the road. As their trucks passed, Gedenberg saw defendant suddenly look up, surprised and startled to see the catering truck stopped ahead. Defendant, who had been traveling at 55 miles per hour (the speed limit for that section of the highway) reacted by slamming on his brakes, which locked up and put the truck into a skid.

As defendant's truck skidded forward, the cab missed the catering truck, but the left-rear tires of the tractor and the left side of the trailer struck the rear corner of the catering truck, catapulting it into the path of Olsen's logging truck. The resulting collision killed the victim (the driver of the catering truck). Defendant's truck, meanwhile, continued to skid forward another 60 feet before coming to a stop in a ditch on the far side of the intersection. Defendant's truck incurred minor damage from clipping the catering truck and going into the ditch.

Two witnesses who also had been driving westbound on Highway 18 on the date of the accident, Mr. and Mrs. Morrison, testified about their observations of defendant's driving for six or seven miles before the collision. Mrs. Morrison first

noticed defendant at the intersection of Highway 18 and Highway 99, at which point defendant turned fast onto Highway 99 and "just flew across" the railroad tracks after the turn. Mrs. Morrison, who was driving, rarely comments on the driving of others, but she called defendant's driving to her husband's attention, who had been doing paperwork in the passenger's seat. As defendant and the Morrisons approached McMinnville on Highway 18, there were two westbound lanes of travel. The right-hand lane, in which defendant was traveling, eventually became a turn-only lane into McMinnville. The left-hand lane, in which the Morrisons were traveling, bypassed McMinnville and continued towards the coast. A sign marked the turn-only lane, but defendant did not merge into the left-hand lane as he passed that sign. Instead, he remained in that turn-only lane until the "last second." Then, just as the turn-only lane split off into McMinnville, defendant abruptly cut into the left-hand lane without signaling and forced traffic in that lane to come to a near stop.

Once in the left-hand lane, defendant continued westbound. Ahead of him was a small school bus. Defendant began traveling "awfully close" to the school bus. Mrs. Morrison told her husband: "I hope there [are] no kids in that bus because he's right on them." By that point, the Morrisons were paying attention to everything defendant did because his driving "stuck out like a sore thumb." As the school bus exited into McMinnville, defendant's truck moved further ahead of the Morrisons when a car between the Morrisons' car and defendant's truck turned off the highway. The Morrisons lost sight of defendant shortly before the collision and, as a result, did not see defendant's truck as it skidded toward the intersection and hit the catering truck.

4

Just after the accident, police interviewed defendant and obtained his statement. Defendant stated that he had been following the catering truck about three truck-lengths behind (*i.e.*, about 180 feet) when the catering truck stopped "suddenly." Defendant told police that the catering truck had no running lights, no brake lights, its left turn signal was not flashing, and there simply was no way for defendant to avoid the catering truck except to do what he did. According to defendant, what he did was "swing wide" and immediately steer his truck to the right and into the ditch to avoid hitting the catering truck.

Defendant's report was inconsistent with the physical evidence of the collision. One of the state's accident reconstruction experts, Trooper Pierce, concluded that defendant began braking about 382 feet before the collision. Pierce calculated that distance based on defendant's speed, the skid marks left by defendant's truck, defendant's likely reaction time, and the time it takes for air brakes on a tractor and trailer to engage. Given where the skid marks began (about 169 feet from the collision) and the delays involved before the skid marks would have started, Pierce concluded that it was physically impossible for defendant to have been only three truck lengths behind the catering truck when defendant hit his brakes.

The physical evidence further established that defendant did not "swing wide" to the right, contrary to his statement to police. The skid marks left by defendant's truck were long and straight, up to the area of the impact. Where they began, the right side of defendant's trailer was on the fog line and the left side was well within his lane of travel. Just before the point of impact, the right tire skid marks "just barely" crossed over

5

the fog line and onto the shoulder of the road. Defendant's truck may have drifted to the right slightly either due to gravity (from the curvature of the road) or because the truck was oriented in that direction at the moment that defendant hit his brakes. But the only point at which the truck "swerved" to the right was at the moment of impact. Momentum then carried defendant's truck into the right-hand ditch. Pierce concluded, based on the physical evidence, that defendant did not react to the stopped catering truck by attempting to steer to the right of it and that, throughout the skid, there had been no "steering input."

Finally, both witnesses to the collision and expert testimony established that the catering truck's brake lights and running lights were on, and its left turn signal was flashing before the collision. In particular, Gedenberg, when he first noticed the catering truck as it pulled to a stop, saw the catering truck's front running lights on and its left turn signal flashing. After passing defendant's truck, Gedenberg looked in his rear view mirror, and specifically noticed that the catering truck's tail lights and brake lights were on before the collision. Gedenberg did not recall if the rear left turn signal was flashing. But the expert testimony established that the rear bulb, which served both as a brake light and a left turn light, was operative at the moment of the collision, suggesting that the catering truck's rear left signal light would have been flashing as well.

At trial, the essential dispute was whether the evidence supported a finding, beyond a reasonable doubt, that defendant had acted with the mental state of criminal negligence in causing the fatal collision. On defendant's motion for judgment of acquittal, the trial court concluded that the evidence created an issue of fact in that regard and denied defendant's motion. At the conclusion of the trial, the court, sitting as the

6

finder of fact, found that defendant acted with the requisite criminally negligent state of mind and, therefore, found defendant guilty as charged. Rather than summarily announce its verdict, however, the trial court explained its reasoning in detail.

The trial court identified multiple factors that influenced its finding that defendant acted with criminal negligence. They included:

(1) Defendant was a professional commercial driver operating a heavy vehicle, and he was trained in the "increased risks that go along with operating a vehicle of that nature on a public highway."

(2) Defendant's trailer was empty, making it difficult to stop, and defendant knew that fact.

(3) The highway was wet.

(4) The highway had only two lanes, which meant defendant was driving under circumstances where he knew that he had less room to maneuver.

(5) Defendant's unsafe driving before the collision, as witnessed by other drivers, showed that he had been driving beforehand with a mental state that displayed a lack of caution and prudence.

(6) The collision occurred in a designated safety corridor.

(7) Defendant had some familiarity with the route and was aware of both the greater risks of that area of highway and the need for driving with greater attention and care.

(8) Defendant was looking down before the collision and appeared shocked when he saw the catering truck, which was evidence that his lack of attention was protracted rather than just momentary.

(9) The catering truck had its turn signal on, was clearly visible to other drivers on the road, and did not stop abruptly.

(10) Defendant could have swerved to the right, where the shoulder was widened and paved, and likely could have avoided the collision entirely, but defendant did not do so.

The court found that defendant's failure to pay attention to the road and his driving was,

given the totality of the circumstances, a "gross deviation" from the standard of care that a reasonable person would have observed in a similar situation and therefore constituted criminal negligence. *See* ORS 161.085(10) (defining "criminal negligence"). Defendant appealed his conviction, and, as noted, the Court of Appeals affirmed without opinion.

On review, defendant first argues that the trial court erred in admitting the Morrisons' testimony regarding his driving before the collision because that evidence was irrelevant and unfairly prejudicial. His principal argument, however, is that -- even if the Morrisons' testimony was correctly admitted -- the evidence that the state presented was insufficient to support a conclusion that he acted with the requisite mental state of criminal negligence. We begin with defendant's argument that the Morrisons' testimony was not relevant under OEC 402.[2]

Defendant argues that the Morrisons' observations of his driving approximately 10 to 15 minutes before the accident were not relevant because the specific conduct that the Morrisons described played no part in the collision. Defendant reasons that evidence of prior driving would be admissible only if the state could

---

[2] OEC 402 provides:

"All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon, or by Oregon statutory and decisional law. Evidence which is not relevant is not admissible."

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401.

8

demonstrate that the specific conduct that the Morrisons had witnessed -- which defendant characterizes as "driving fast while making a turn, making an unsignaled lane change, and closely following a school bus" -- continued up to the time of the collision and contributed to the collision. The state responds that the Morrisons' observations of defendant's driving occurred close in time to the collision and were evidence of his ongoing lack of awareness and care in his driving from that time until the collision.

The trial court concluded that the prior driving evidence was relevant, and we agree. In *State v. Betts*, 235 Or 127, 133, 384 P2d 198 (1963), the defendant was convicted of negligent homicide under *former* ORS 163.091 (1957), *repealed by* Or Laws 1971, ch 743, § 432, for killing a passenger in his car when he crashed after rounding a corner at 90 miles per hour while intoxicated. The defendant objected to testimony that, before the accident, he had left "ten feet of tire marks" when accelerating from a stop. *Id*. The defendant argued that that testimony was not relevant to his state of mind when, one and a half hours later, he took a corner at 90 miles per hour while intoxicated and caused the death of the victim. *Id*. This court disagreed, holding that, in general, evidence of a person's driving before the time and place of an accident is relevant to that person's state of mind at the time of the accident. *Id*. This court did not, in *Betts*, require that the prior conduct be the same specific conduct involved in causing the later accident. The question was whether the prior conduct (speeding from a stop) logically permitted an inference of an ongoing state of mind.

The holding in *Betts* is consistent with the legal test for relevancy. The threshold for relevance is low. *State v. Clegg*, 332 Or 432, 441-42, 31 P3d 408 (2001).

Relevant evidence under OEC 401 is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  The Morrisons' observations met that standard.  The Morrisons observed defendant's driving as they followed defendant on Highway 18 for about six or seven miles, throughout which defendant drove in a way that placed others on the road at significant risk.  Logically, defendant's actions could have been due to his persistent failure to pay attention to his driving and thus to his distracted and inattentive state of mind.  For instance, his sudden lane change near McMinnville permitted a conclusion that he did not see the sign warning that the lane would split off and that he realized where he was only moments before arriving at the split.  Tailgating, likewise, can result from a driver's failure to watch or focus on the road.  The Morrisons' observations thus were logically relevant to the issue of defendant's state of mind at the time of the collision.  *See State v. Salas-Juarez*, 349 Or 419, 428-29, 245 P3d 113 (2010) (evidence that person responded with verbal threat to minor altercation in bar an hour and a half before assault at issue relevant to show that person's ongoing "angry state of mind," which factfinder could consider in determining who committed otherwise unrelated violent assault).

Defendant also argues that the Morrisons' testimony, even if relevant, was inadmissible because it was unfairly prejudicial under OEC 403.[3]  The trial court, in

---

[3]    OEC 403 provides:

10

rejecting defendant's OEC 403 argument, observed that, "[i]f there is any danger of prejudice, it might be that the jury might think that, well, maybe [defendant] did make a bad pass or engage in some poor driving earlier and, therefore, he must have engaged in the same at the time that led to this collision."  The trial court concluded, however, that the minimal risk of the jury considering the Morrisons' testimony for that purpose did not outweigh the probative value of the evidence on the issue of defendant's state of mind.  *See State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996) (unfair prejudice under OEC 403 means evidence has tendency to cause trier of fact to make decision on an improper basis; that tendency must "substantially" outweigh probative value to render relevant evidence inadmissible).  The trial court did not abuse its discretion in so concluding and thus did not err.  *See State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999) (appellate court reviews OEC 403 ruling for abuse of discretion).

We turn to whether the trial court erred in denying defendant's motion for a judgment of acquittal and subsequently finding defendant guilty of criminally negligent homicide.  Because the parties disagree regarding the meaning of "criminal negligence" as defined in ORS 161.085(10), the mental state required for criminally negligent homicide, we begin with that issue.  As noted, "[a] person commits the crime of criminally negligent homicide when, with criminal negligence, the person causes the

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

11

death of another person." ORS 163.145(1). "Criminal negligence," when used with respect to a prohibited result defined by statute -- in this case causing the death of another person --

> "means that a person fails to be aware of a substantial and unjustifiable risk that the result [the death of another person] * * * will occur * * *. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(10).

On the spectrum of culpable mental states, criminal negligence falls between negligence and recklessness:

> "Negligence is the least demanding; it requires only that the defendant *should have* known about a risk. Criminal negligence similarly considers whether the defendant *should have* known about the risk, but it also requires that the risk be a 'gross deviation from the standard of care that a reasonable person would observe in the situation.' ORS 161.085(10). Recklessness demands proof of a different and more culpable mental state. Although the nature of the risk is the same as for criminal negligence ('a gross deviation from the standard of care that a reasonable person would observe'), the standard is no longer what the defendant *should have* known; instead, a defendant must have been 'aware of and consciously disregard[ed]' that risk. ORS 161.085(9)."

*Morehouse v. Haynes*, 350 Or 318, 332-33, 253 P3d 1068 (2011) (De Muniz, C. J., concurring) (emphases in original; footnotes omitted).

In *Morehouse*, this court addressed the differences between the mental states of negligence and recklessness in the context of a civil action arising out of an

12

automobile collision.[4] In that case, we concluded that the plaintiff's evidence was sufficient to create a jury question as to whether the defendant's driving was reckless. *Id*. at 328. More specifically, we determined that a jury could find that the defendant's conduct -- entering a sharp curve at 20-25 miles per hour above the recommended speed while taking his eyes off the road to tune the radio -- created a "substantial and unjustified risk" of harm to persons or property and that disregarding that risk was a "'gross deviation' from what a reasonable driver would do in the same situation." *Id*. at 331. In this case, we address a related issue: whether the facts are sufficient to create a jury question regarding the mental state of criminal negligence, a degree of culpability that, as noted, is greater than negligence, but less than recklessness.

Defendant argues that the standard for criminal negligence established by ORS 161.085(10) is "much higher than for civil negligence and requires not only nonperception of a risk but also seriously blameworthy conduct creating that risk." Defendant notes that the Oregon legislature modeled ORS 163.145(1) (prohibiting criminally negligent homicide) and ORS 161.085(10) (definition of criminal negligence) on New York statutes, which in turn followed the rationale of the Model Penal Code. *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code,

---

[4] Although *Morehouse* was a civil action, ORS 161.085 was pertinent there because, if the defendant had been driving "recklessly" as defined by that criminal code statute, the plaintiff, who had been driving uninsured, was entitled to recover noneconomic damages despite his uninsured status (a recovery otherwise barred by ORS 31.715(1)).

Final Draft and Report ("Commentary") §§ 11 & 91, 10-11 & 91-92 (July 1970) (so stating). Defendant also points out that the legislative history indicates that one of the committees charged with revising the criminal code contemplated that the case law of New York and other states that had adopted the Model Penal Code would be useful in interpreting Oregon's version of those same statutes.[5] *See* Minutes, Criminal Law Revision Subcommittee No 1, Dec 18, 1968, 2 (so stating).

Defendant relies primarily on *People v. Boutin*, 75 NY2d 692, 696, 555 NE2d 253, 254 (NY 1990), in which the New York Court of Appeals held that criminally negligent homicide requires both a "failure to perceive a risk of death, [and] some serious blameworthiness in the conduct that caused it." In that case, the defendant had been convicted of criminally negligent homicide after he failed to see the flashing lights of a police car and collided with the car at full speed, killing the officer and another person. *Id*. at 694-95, 555 NE2d 253-54. In reversing his conviction, the court held that "[t]he unexplained failure of a driver to see the vehicle with which he subsequently collided does not, without more, support a conviction for the felony of criminally negligent

_____

[5] When Oregon adopts a statute modeled after another jurisdiction, an interpretation of that statute by that jurisdiction's highest court rendered *before* the adoption of the statute by Oregon is considered the interpretation of the adopted statute that the Oregon legislature intended. *State v. Stockfleth/Lassen*, 311 Or 40, 50, 804 P2d 471 (1991). The New York cases that defendant cites, however, were decided *after* Oregon adopted its revisions to the criminal code in 1971. Accordingly, we consider them only for the persuasive value of their analysis. *See State v. Warner*, 298 Or 640, 650, 696 P2d 1052 (1985) (examining later case law from New York as persuasive authority when Oregon statute based on New York statute).

14

homicide." *Id*. at 694, 555 NE2d at 253. Although the defendant likely had been negligent in failing to see the police car, he had not "engaged in any criminally culpable risk-creating conduct" and thus could not be convicted of criminally negligent homicide. *Id*. at 697, 555 NE2d at 255-56. Defendant urges us to follow *Boutin* and require that a defendant's conduct be "seriously blameworthy" in order to find criminal negligence.

Defendant argues that civil cases in Oregon decided under the "guest passenger" statute also support his position that a defendant's conduct must be "seriously blameworthy" to prove the mental state of criminal negligence. First, he asserts that the standards for "gross negligence" under the now-repealed guest passenger statute and "criminal negligence" under ORS 161.085(10) are comparable.[6] Defendant notes that a finding of gross negligence under the guest passenger cases generally required finding

---

[6]     As this court explained in *State v. Hill*, 298 Or 270, 279, 692 P2d 100 (1984), "[p]rior to the criminal code revision of 1971, gross negligence and recklessness comprised the same mental state for purposes of the automobile guest statute, as well as for criminal liability." The 1971 revisions to the criminal code distinguished between criminal negligence (what previously had been called "gross negligence") and recklessness. *Id*. "Recklessness" now requires a higher mental state than gross negligence did under the guest passenger statute because the defendant must be "aware of and consciously disregard[ ]" the applicable risk. *Morehouse*, 350 Or at 323 (quoting ORS 161.085(9)). The standard for "gross negligence" and "recklessness" under the guest passenger cases, however, do not provide an exact analog for the definition of "criminal negligence" in ORS 161.085(10). *Compare Williamson v. McKenna*, 223 Or 366, 394-95, 354 P2d 56 (1960) (adopting *Restatement of Torts* § 500 (1934) to define both gross negligence and recklessness) *with* ORS 161.085(10) (defining criminal negligence). Nevertheless, in the guest passenger cases, this court attempted to draw a principled distinction between conduct that was merely negligent and conduct that demonstrated a more culpable state of mind, and we occasionally have looked to those cases for guidance on the issue. *See, e.g.*, *Morehouse*, 350 Or at 326-27, 330.

15

that the defendant possessed an "attitude of indifference to [the] consequences" of his or her conduct. *Keefer v. Givens*, 191 Or 611, 622, 232 P2d 808 (1951). In defendant's view, an "attitude of indifference" parallels the notion of "seriously blameworthy" conduct adopted by the New York Court of Appeals to distinguish criminal negligence from ordinary negligence. Defendant draws several examples from New York and Oregon case law to illustrate conduct that is "seriously blameworthy" or that exhibits an "attitude of indifference," including exceeding the speed limit and failing to heed various warning signs. *See, e.g.*, *Boutin*, 75 NY2d at 696-97, 555 NE2d at 254-55; *Keefer*, 191 Or at 622-24.

The state responds that defendant attempts to insert additional elements into the definitions of "criminal negligence" and "criminally negligent homicide" by requiring the state to prove that defendant's conduct was seriously blameworthy or that defendant exhibited an attitude of indifference. In the state's view, the definition of "criminal negligence" in ORS 161.085(10) and the definition of "criminally negligent homicide" in ORS 163.145(1) do not focus on any specific conduct by defendant. Rather, those statutes, by their terms, require only that the state prove that defendant's conduct -- driving in a way that caused the victim's death -- was accompanied by the mental state of criminal negligence: that defendant "fail[ed] to be aware of a substantial and unjustifiable risk" of the victim's death and that the failure to be aware of that risk was a "gross deviation" from the standard of care that a reasonable person would have observed in the same circumstances. According to the state, then, neither statute requires it to prove that the conduct that caused the victim's death was itself "blameworthy."

16

The state also argues that the guest passenger cases decided before the enactment of the criminal negligence definition in 1971 do not support defendant's contention that the state must prove that defendant exhibited an "attitude of indifference to consequences." The state argues that requiring an "attitude of indifference" assumes "some level of awareness" -- as opposed to the statute's emphasis on a *lack* of awareness -- and the "conscious disregard" of the potential consequences of risky behavior. The state asserts that defendant's proffered interpretation thus is inconsistent with ORS 161.085(10), which contemplates that a defendant may be criminally negligent even if the defendant is not aware of the risks of his or her conduct and does not "consciously disregard" those risks. Moreover, the state argues, the 1971 revision to the criminal code explicitly distinguished criminal negligence from recklessness by requiring an awareness and conscious disregard of risk for recklessness, but only requiring that a defendant "should have been aware" of the risk for criminal negligence. *See* Commentary § 11 at 10 (so stating).

We agree with substantial parts of the state's argument regarding the definition of "criminal negligence." Contrary to defendant's assertions, ORS 161.085(10) does not require the state to prove that defendant engaged in "seriously blameworthy" conduct or that defendant's conduct exhibited an "indifference to consequences." Although conduct that is seriously blameworthy in some moral sense or that demonstrates indifference to consequences could, in a particular factual setting, certainly provide proof of a criminally negligent state of mind, the statute itself requires only that the risk of a particular result from defendant's conduct be "substantial and unjustifiable" and that

17

failure to be aware of that risk be a "gross deviation" from the standard of care a reasonable person would observe. In short, whether conduct exhibits a criminally negligent state of mind will depend, in large part, on the factual context in which the conduct occurs. That is so because the ordinary negligence standard of care that provides the benchmark for determining whether the defendant's conduct was a "gross deviation" must derive from the conduct of a "reasonable person" in that factual context. Whether the conduct is "blameworthy" -- essentially a moral judgment -- standing alone, is relevant, but not dispositive, in determining whether the conduct constituted a "gross" deviation from the conduct of a reasonable person.

To insert a requirement that the conduct must be "seriously blameworthy" or that the defendant be "indifferent to consequences" would, as the state argues, shift attention away from the elements identified in the definition of criminal negligence -- the lack of awareness of risk and the deviation from the reasonable person standard of care. That said, not every deviation from the standard of care and not every failure to be aware of the risk involved constitutes criminal negligence. Only if the failure to be aware of the risk is a "gross" deviation from that of a reasonable person can a defendant be found to have acted with criminal negligence.

We return to the facts of this case to evaluate whether the evidence presented at trial was sufficient to support the trial court's finding, as trier of fact, that defendant acted with the mental state of criminal negligence. In making that evaluation, we of course must view the evidence in the light most favorable to the state, resolving all conflicts in the state's favor and granting the state the benefit of all reasonable inferences

18

that the evidence will support. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994).

In challenging the sufficiency of the evidence, the crux of defendant's argument is that, at best for the state, defendant was merely inattentive for a brief period of time in causing the accident. That brief inattention, defendant argues, amounted to mere negligence as a matter of law, rather than a "gross deviation" from the standard of care that a reasonable person would have observed under the circumstances, as criminal negligence requires. Defendant emphasizes that, at trial, the state's own experts testified that defendant's speed had not been a factor in the collision, that he had not followed the catering truck too closely, and that he was not under the influence of alcohol or drugs. Defendant asserts that there was no evidence that he could have prevented the accident -- once he became aware of the victim's truck -- had he taken different actions.

We agree that, if this case involved only a driver's brief inattention to his driving and nothing more, the evidence likely would fall short of establishing criminal negligence. In that respect, this court's decision in *Morehouse* is instructive. As we have described, *Morehouse* involved recklessness as defined by ORS 161.085(9), which is a higher, more culpable mental state than criminal negligence. The court in *Morehouse* concluded that the evidence created a jury question on recklessness because the defendant was familiar with the road on which he was driving (and so inferentially he knew about the sharp turn); he entered the curve at a speed 20-25 miles above the "advisory" -- although not legally mandated -- speed; and while he did so, he glanced down for about a second to tune the radio. *Morehouse*, 350 Or at 331, 321. The court determined that the combination of the defendant's failure to heed the cautionary speed and his one-second

19

glance downward while doing so was enough to allow a jury to find (whether or not it in fact would) that the defendant's failure to exercise care was a "gross deviation" from what a reasonable driver would do in the same situation. *Id.* at 331. And, given those facts, the defendant not only should have known of the risk that he created (as criminal negligence requires), but he in fact knew of that risk (as recklessness requires). *Id.*

Likewise, this case involves more than mere inattention. Here, although defendant was not speeding unlawfully, he was traveling in a "safety corridor," and thus a particularly hazardous section of road, at the maximum legally permissible speed. In addition, defendant's truck was unloaded, which reduced its stopping capability,[7] and the road was wet, which reduced friction for braking. Cars qualify as inherently dangerous weapons. *State v. Hill*, 298 Or 270, 277, 692 P2d 100 (1984). Commercial semi-trucks, given their bulk and weight, are less maneuverable, less stoppable, and more deadly in a collision than an ordinary car. The record in this case bears that out. Car brakes engage instantly, slowing the car as soon as the driver pushes the brake pedal. Air brakes, like those on defendant's truck, do not engage and begin slowing the struck until a full two seconds after the driver first pushes the brake pedal. A professional commercial driver,

---

[7]     The record establishes that an unloaded commercial truck with air brakes cannot stop as quickly as a heavily loaded one. The reason for that somewhat counterintuitive fact is that, when equipped with air brakes, the "brakes, tires, springs, and shock absorbers on heavy vehicles are designed to work best when the vehicle is fully loaded." 2012-2013 Oregon Commercial Driver Manual (Driver and Motor Vehicle Services), at 2-12. In the case of a commercial truck equipped with air brakes and traveling at 55 miles per hour, "an average driver under good traction and brake conditions" will have a total minimum stopping distance of over 450 feet. *Id.* at 5-7.

20

of course, would know those steering and stopping limitations of his vehicle. Defendant would have known all of the above facts, or at least a jury could so find. Defendant's failure, as a licensed commercial truck driver, to watch the road ahead and the traffic on it for any significant period of time, even if momentary, while traveling in a safety corridor, under wet-road conditions, with an unloaded truck at the maximum legal speed, refutes defendant's position that this is a case of inattention, nothing more, and thus a case of mere negligence.

More fundamentally, however, we disagree with defendant that the only conclusion that the record supports is that defendant's inattention was merely brief or fleeting. In that regard, the parties spar at some length over the significance of Gedenberg's testimony, who said that, as he passed the stopped catering truck and continued eastbound, he had been able to observe defendant for about five seconds as defendant approached from the opposite direction, throughout which time defendant had his eyes cast downward and was not watching the road ahead.[8] The trial court, who was

---

[8] Briefly described, the dispute over Gedenberg's five-second estimate arises because, given the speeds at which his truck and defendant's truck were traveling, Gedenberg would have been nearly 700 feet away from defendant when he would have first noticed defendant. The parties disagree whether a finder of fact could find that Gedenberg could see defendant well enough at that distance to reliably describe him as looking down, instead of at the road, from the time Gedenberg first noticed defendant's truck. Defendant essentially argues that such a conclusion belies common sense and common experience, while the state responds that no evidence refuted Gedenberg's ability to see defendant from that distance. Because of the adequacy of the evidence even without Gedenberg's time estimate, we need not resolve the parties' disagreement in that regard.

21

the trier of fact, found Gedenberg credible, but was unsure that his estimate of 5 seconds was accurate. In the trial court's view, however, whether Gedenberg could see defendant throughout the 5 seconds was "academic," because the evidence as a whole persuaded the trial court that defendant in fact was inattentive for a protracted and significant period of time. As the trial court expressly described it, "if there was one phrase that might characterize this case in the court's view[, it is] gross inattention."[9]

Because the record amply supports the trial court in that regard, we need not decide whether Gedenberg's testimony alone could establish how long defendant had failed to pay attention to the road ahead of him. First, the physical circumstances of the collision demonstrate the protracted time during which defendant was distracted or otherwise inattentive. The catering truck came to a slow, controlled stop as Gedenberg approached the intersection. It was fully stopped by the time Gedenberg, traveling at 45 miles per hour, passed it. As Gedenberg passed defendant's truck farther down the road, defendant looked up, surprised to see the catering truck stopped ahead, and slammed on his brakes. From the physical evidence at the scene (principally, the skid marks), the accident reconstruction expert determined that that "moment of perception" for defendant happened about 382 feet from the intersection. At the speed that Gedenberg's truck was traveling, it would have taken 5.78 seconds for him to travel from the stopped catering

---

[9] The trial court made those remarks at sentencing. But they are consistent with, if merely more succinct than, the remarks that the trial court made in rendering its verdict of guilt.

22

truck to the point where Gedenberg saw defendant first look up and notice the catering truck.[10] The trier of fact could readily infer from defendant's shocked expression that defendant did not see the stopped catering truck throughout that time, and that the reason he did not see it was that he was not looking at the road ahead.

The Morrisons' testimony was a further basis on which the trier of fact could find that defendant was distracted and inattentive for a protracted time. As earlier described, the Morrisons followed defendant on Highway 18 for six or seven miles, losing sight of him shortly before the collision. Throughout the time that the Morrisons were within sight of defendant, his driving was consistent with that of someone who was not paying attention to the road ahead of him. We have already described that evidence at some length and need not do so again here. It suffices to observe that, based on the evidence of defendant's earlier driving, a rational factfinder could conclude that defendant's inattention as he approached the catering truck was not just momentary or fleeting, but was instead the continuation of an ongoing distracted and inattentive mental state that characterized his driving for much or all of that morning.

Finally, in finding that defendant acted with criminal negligence, the trial court concluded that "the l[i]nch pin to the case" was the avoidability of the fatal collision. And it was avoidable, the trial court concluded, in two independent ways. First, defendant could have avoided the collision had he paid attention to the road ahead

---

[10] At 45 miles per hour, Gedenberg was traveling about 66 feet per second. Time equals distance divided by rate: the distance traveled, 382 feet, divided by 66 feet per second, equals 5.78 seconds.

of him.  Instead, however, he was distracted for a prolonged time, which was a particularly aggravated circumstance given defendant's training as a professional commercial driver, the highly dangerous vehicle he was driving, and the dangerous area of road he was on, among other factors.  Second, the trial court found, defendant failed to avoid the accident as he could have, by steering to the right of the stopped catering truck onto the adjacent shoulder of the road.  As the photographs and diagram of the accident site show, the adjacent shoulder in that area, designated on the exhibit of the collision as a "paved shoulder/by-pass," is much wider than along the highway generally.  It is not an ordinary paved shoulder, but instead is nearly as wide as would be a second westbound lane of travel.  The paved shoulder begins at just about the point where defendant first hit his brakes and continues to the end of the intersection.  Because of the existence of the by-pass shoulder, ample pavement existed on the right side of the fog line for defendant to veer his truck to the right in a way that could have avoided the collision entirely.

There would have been a problem in doing that, however.  As the exhibits in this case show, that shoulder narrowed again immediately after the intersection.  At that point, a vehicle traveling at a fast rate of speed and unable to swerve back to the pavement would have found itself off hard pavement, and into the adjacent ditch area, where defendant in fact ended up when the impact of the collision caused his truck to swerve sharply to the right.  Given his speed, and his delay in seeing the stopped catering truck, defendant could not veer to the right onto the paved by-pass shoulder and avoid the collision without risking driving off the pavement, possibly causing damage to his truck (as ultimately occurred) and delaying his own trip (as ultimately occurred as well).

24

That evidence caused the trial court to conclude that defendant acted with criminal negligence, not only because of his prolonged inattention before he noticed the catering truck, but because of his choice to not do more to avoid the collision:

> "[A]s the photographs show, in my view, if some further steps had been taken, this collision still might [have] been avoided.
>
> "I believe that [defendant] did take some steps to try to avoid the collision, and he did steer the vehicle more to the right.[11]
>
> "But * * * it could have been steered over to the right sooner and into that lane.
>
> "And I think, quite frankly, when the bottom line is read, [defendant] *tried to thread the needle*. He tried to go far enough to the right to avoid the collision and yet not so far to the right that he couldn't get back on the road.
>
> "Had he gone a little further to the right, there is ample room at this point on this day and under those circumstances that this collision would * * * not have occurred. He had the room to do it. He could have done it. He didn't do it. And that's criminally negligent homicide."[12]

---

[11] As earlier observed, there was no evidence that defendant, consistently with his statements to police investigators, steered sharply to the right to avoid the accident, and the trial court expressly found that defendant did not do that. The trial court also, however, evidently concluded that defendant's truck was to the right-hand side of the lane, with its outside tires on the fog line, because of some slight steering input by defendant before his brakes locked and the truck began to skid. As the remainder of the trial court's findings make clear, the trial court found that defendant tried to "thread the needle" so that his own trip would not be delayed, when he could have avoided the collision entirely.

[12] The trial court made those observations at sentencing, but in doing so, was merely expanding on statements it made in rendering its verdict that were to the same effect. Nothing prevented the trial court from further explaining its verdict at the time of sentencing, and there is no reason why this court should disregard it. *See*, *e.g.*, *Strawn v. Farmers Ins. Co.*, 350 Or 336, 368, 258 P3d 1199 (2011) (trial court explanations and findings are generally very helpful to appellate review, and later explanation of earlier

25

(Emphasis added.)

Thus, contrary to defendant's argument, there was evidence from which a rational factfinder could find -- and this record establishes that the factfinder did in fact so find -- that defendant could have taken actions to avoid the catering truck even after, due to his own inattentiveness, he noticed it too late in time to stop.

For those reasons, we conclude that the record in this case was sufficient to support the finding that defendant acted with criminal negligence. The trial court therefore correctly denied defendant's motion for judgment of acquittal.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

ruling by trial court, where no statute precludes later explanation, should be given full consideration).