JAMES, J.
*344 *864 Defendant appeals his conviction and sentence for first-degree sexual abuse, ORS 163.427, assigning error to the sentencing court's imposition of a mandatory 75-month sentence imposed pursuant to ORS 137.700 (Ballot Measure 11 (1994)) over his constitutional proportionality challenge relying on State v. Rodriguez/Buck , 347 Or. 46, 217 P.3d 659 (2009), and State v. Ryan , 361 Or. 602, 396 P.3d 867 (2017). In this case, the trial court found that defendant suffered from intellectual disability and considered that disability in relation to defendant's criminal culpability. However, the court specifically found that it could not consider the "the fact that [defendant] may be victimized in prison" as a result of that intellectual disability. Thus, this case presents a question going to the heart of what it means to consider intellectual disability in a proportionality challenge. If a trial court expressly finds that it cannot consider an intellectually disabled defendant's increased vulnerability within prison, has it truly "consider[ed] an offender's intellectual disability in comparing the gravity of the offense and the severity of a mandatory prison sentence? " Ryan , 361 Or at 620-21 (emphasis added). To put an even finer point on it, in considering intellectual disability in the context of the "severity" of a sentence, is a court limited to merely the quantitative severity of a sentence, i.e. , the length of incarceration, or is a court permitted to consider the qualitative nature of a sentence's severity as applied to an intellectually disabled defendant?
As we explain below, the issue raised by defendant is an interesting, and unresolved, issue of Oregon law. But, ultimately, we cannot reach a resolution here. Article VII (Amended), section 3, of the Oregon Constitution states that when we conclude, "after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial." Here, even assuming the trial court erred in failing to consider defendant's vulnerability *865 within the prison, on this record that error was harmless. Accordingly, we affirm.[1]
In considering a sentence proportionality challenge under Article I, section 16, "we review for legal error the trial court's *345 conclusion that defendant's sentence was constitutional[.]" Ryan , 361 Or. at 614, 396 P.3d 867. "In conducting that review, we are bound by any findings of historical fact that the trial court may have made, if they are supported by evidence in the record." Id. at 615, 396 P.3d 867. In this case, defendant pleaded guilty to sexual abuse in the first degree, ORS 163.427, acknowledging that he knowingly subjected a child under the age of 14 to sexual contact by touching her genital area with his mouth.
During sentencing, defendant presented evidence that his cognitive abilities were about that of a 10-year-old *866 child. One expert testified that defendant was "very, very slow. [Defendant's] processing speed is at the [0.3] percentile, meaning 99.7 percent of people do better than him." In addition, defendant offered testimony that he suffered from fetal alcohol syndrome (FAS). Defendant presented evidence that one of the effects of FAS is an impairment of one's ability to read social cues. Defendant's expert explained:
"[Those with FAS are] poor readers of social cues. And, as we know in prisons, one has to be very aware of social cues. *** [Defendant]'s going to have what's called bad papers, because he sexually abused a child. He's also intellectually impaired, socially dysfunctional. And, because of that he's going to be a target for predatory behavior."
When asked if that meant that defendant would be "[t]he prey," the expert responded, "Yeah. He will be victimized ." (Emphasis added.)
Another expert testified that:
"For people who are developmentally delayed, they are far more likely to be victimized [in prison] . And, specifically, I would go back to yesterday where [defendant] demonstrated extreme naïveté about his fellow prisoners and how they would help him.
"* * * * *
"That's very different than the prison culture that's going to see him as prey."
(Emphasis added.)
After testimony regarding defendant's cognitive abilities and the likelihood of victimization in a prison setting, the sentencing court made factual findings that defendant had a mental deficiency, had a diminished capacity, and suffered from FAS. The court found that it could take into consideration defendant's diminished capacity in assessing proportionality. However, as part of that consideration of intellectual disability, defendant argued that the sentencing court could consider defendant's vulnerability in the prison system. The sentencing court declined to do so, holding that it could not take into account defendant's potential for being *867 victimized in prison due to his intellectual disabilities. The sentencing court stated:
"I generally accept the fact that he has a diminished capacity and * * * it's probably as low as what the testimony shows it is. What I don't think I can take into account is the fact that [defendant] may be victimized in prison. "
(Emphasis added.)
The sentencing court ultimately found that defendant was a high risk offender, that defendant's conduct was at the extreme end of sexual abuse in the first degree, had been opportunistic, and had occurred over a long period of time, and that defendant knew his actions were wrong when he was committing the abuse as evidenced by the fact that defendant plied the victim with treats to prevent her from disclosing the abuse. The sentencing court further found that defendant was able to distinguish between people he likes and dislikes, using the example of a letter from jail that defendant wrote to his family that requested his family crop a picture of his brother, the father of the victim, from a photo he wanted his family to send him. The court then considered the age of the victim and the victim's close family relationship to the defendant, the fact that the victim was permanently harmed, and noted that defendant had a prior juvenile adjudication for molesting a different young girl. The court also noted that defendant had pleaded down to sex abuse in the first degree from a charge of sodomy in the first degree, which carried a Measure 11 sentence of 300 months. Defendant was sentenced to 75 months of prison to be followed by post-prison *346 supervision, the total duration of both not to exceed 10 years.
On appeal, defendant argues that the sentencing court erred when it declined to consider defendant's vulnerability in prison in assessing sentence proportionality under Article I, section 16, and the Eighth Amendment to the United States Constitution. The state argues that the sentencing court did not err in refusing to consider defendant's vulnerability in prison because, in considering sentence proportionality, the severity of a penalty is assessed solely as to the length of the sentence, not conditions of confinement. Further, the state argues that the 75-month sentence was *868 constitutional. Finally, the state also argues that if the sentencing court did err in failing to consider defendant's vulnerability, the error was harmless.
Because defendant raises both a state and a federal constitutional challenge, we begin by briefly discussing the differences between the two. The Eighth Amendment, which applies to the states by virtue of the Fourteenth Amendment to the United States Constitution, Robinson v. California , 370 U.S. 660, 675, 82 S. Ct. 1417, 8 L.Ed. 2d 758 (1962), provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Although the Eighth Amendment does not directly address proportionality, the United States Supreme Court has held that [t]he concept of "proportionality is central to the Eighth Amendment." Graham v. Florida , 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L.Ed. 2d 825 (2010).[2]
The nascent Eighth Amendment proportionality jurisprudence has denoted two individual qualities that warrant special proportionality concerns: youth, and intellectual disability. With respect to youth, the Supreme Court has held that "[t]he susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult."
*869 Roper v. Simmons , 543 U.S. 551, 557, 125 S. Ct. 1183, 161 L.Ed. 2d 1 (2005). (Internal quotation marks omitted.) Consequently, "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." Graham 560 U.S. at 76, 130 S.Ct. 2011.
The Supreme Court's treatment of intellectual disability under the Eighth Amendment shows some indications that it mirrors the treatment of juveniles under the Eighth Amendment, although the intellectual disability line of cases is less developed. The Court has held, like in Roper , that "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses, [the intellectually disabled] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." Atkins v. Virginia , 536 U.S. 304, 306, 122 S. Ct. 2242, 153 L.Ed. 2d 335 (2002). As a result, the death penalty is categorically prohibited from imposition upon the intellectually disabled, as it is against juveniles. Id . The Court has never held that sentencing schemes that fail to consider intellectual disability are flawed, as it has for youth. However, the *347 Oregon Supreme Court has noted that "The Supreme Court in Atkins repeatedly emphasized the relevance of intellectual disability in determining both the gravity of an offense and the severity of its penalty." Ryan , 361 Or. at 620, 396 P.3d 867.
Turning to the proportionality inquiry under the state constitution, Article I, section 16, "closely parallels the Eighth Amendment." Billings v. Gates , 323 Or. 167, 173, 916 P.2d 291 (1996). However, unlike the Eighth Amendment, Article I, section 16, explicitly sets out the concept of proportionality:
"Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense ."
(Emphasis added.)
Thus, unlike the Eighth Amendment, where proportionality is an aspect of "cruel and unusual," Article I, section 16, divides the two into distinct concepts. In State v. Wheeler , 343 Or. 652, 665-66, 175 P.3d 438 (2007), the Oregon *870 Supreme Court detailed the history of Article I, section 16, noting that
"[t]he framers combined the cruel and unusual punishment provision and the proportionality provision ***. As we have described above, those provisions have distinct histories and purposes-the proportionality provision has origins in Magna Carta and in Blackstone's argument in favor of punishments that were reasonably related to the severity of particular offenses, while the prohibition on cruel and unusual punishments was first articulated in the English Bill of Rights and focuses on prohibited methods of punishment. Those differences suggest that, when the drafters of the Oregon Constitution combined the two provisions with the word 'but' in Article I, section 16, they did not intend the proportionality provision to be an exception or qualification to the bar on cruel and unusual punishments. See 1 Noah Webster, An American Dictionary of the English Language 29 (1828) (giving 'excepting' as one meaning of 'but'). Rather, the sentence seems to use the word 'but' as the equivalent of 'and' and simply to combine in one sentence those two different rules for criminal penalties. *** In other words, the prohibition on cruel and unusual punishment and the requirement of proportionality appear to be independent constitutional commands, joined in one sentence because they both concern appropriate punishment for crimes."
The proportionality clause of Article I, section 16, recognizes a limit on legislative power. Although the legislature sets criminal penalties, it cannot do so arbitrarily. The Oregon Constitution requires that it invest each legislatively enacted sentence with a rational basis. Jensen v. Gladden , 231 Or. 141, 146, 372 P.2d 183 (1962) ("It is the province of the legislature to establish the penalties for the violation of the various criminal statutes and if the penalties are founded upon an arguably rational basis we have no authority to hold that they are invalid."); see State v. Isom , 313 Or. 391, 400, 837 P.2d 491 (1992) ("The legislature has chosen to subject all such persons to the maximum potential penalty. Defendant's opinion makes sense, but so does that which we attribute to the legislature. There was a rational basis for the legislature to conclude that both classes of escapees are dangerous."). A proportionality inquiry under *871 Article I, section 16, whether framed as a facial challenge or an as-applied challenge, asks if the imposition of the sentence would "shock the moral sense" of reasonable people "as to what is right and proper under the circumstances." Sustar v. County Court of Marion Co. , 101 Or. 657, 665, 201 P. 445 (1921). Answering that "shocks the conscience" question begins with a search for legislative purpose-the rational legislative basis behind the statutory sentence.
An examination of legislative purpose-the rational basis connecting the legislatively enacted sentence to the social harm that the legislature sought to penalize-is itself closely governed by the other constitutional obligation imposed on the legislature when enacting penalties-Article I, section 15, of the Oregon Constitution. That provision sets the permissible legislative purposes, requiring *348 that "[l]aws for the punishment of crime shall be founded on these principles: protection of society, personal responsibility, accountability for one's actions and reformation."
In Rodriguez/Buck , the court set out three nonexclusive factors for consideration in as-applied challenges under Article I, section 16 :
"(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."
347 Or. at 58, 217 P.3d 659.
The Supreme Court in Rodriguez/Buck explained:
"In considering a defendant's claim that a penalty is constitutionally disproportionate as applied to that defendant, then, a court may consider, among other things, the specific circumstances and facts of the defendant's conduct that come within the statutory definition of the offense, as well as other case-specific factors, such as characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim."
Id. at 62, 217 P.3d 659.
Rodriguez/Buck did not define the precise contours of what "severity of the penalty" entailed. However, the court *872 did note that "in contemporary criminal justice systems, including Oregon's, the primary determinant of the severity of a penalty is the amount of time that the wrongdoer must spend in prison or jail, if convicted of that offense." Id . at 60, 217 P.3d 659 (emphasis added). Rodriguez/Buck 's use of the phrase "primary determinant" left the door open for secondary, or nonprimary, determinants of severity that were not simply "the amount of time that the wrongdoer must spend in prison or jail."
The Oregon Supreme Court applied that same principle to intellectual disability, and concluded in Ryan that
"evidence of an offender's intellectual disability therefore is relevant to a proportionality determination where sentencing laws require the imposition of a term of imprisonment without consideration of such evidence. Accordingly, we conclude that, where the issue is presented, a sentencing court must consider an offender's intellectual disability in comparing the gravity of the offense and the severity of a mandatory prison sentence on such an offender in a proportionality analysis."
Ryan , 361 Or. at 620-21, 396 P.3d 867. However, again, the court did not clarify whether severity was simply quantitative, or whether qualitative severity was a consideration.
With that background in mind, we turn to defendant's argument that the trial court erred in refusing to consider defendant's increased vulnerability in the prison system-i.e. , his qualitative experience. According to defendant, that qualitative experience is a necessary consideration in assessing the severity of a sentence. The state disagrees, arguing that the severity of a sentence is fundamentally a question of numbers, i.e. , the length of the term of incarceration, and not a defendant's qualitative experience of incarceration.
The answer to this question is not readily apparent. Ultimately, however, we are compelled to not weigh in on the issue. Defendant's argument before the trial court was premised on one essential fact: that defendant would be subjected to greater risk of abuse while incarcerated because of his intellectual disability, than if he were not incarcerated. A review of this record shows that, even though the trial *873 court held that it could not consider defendant's argument, it explicitly rejected that necessary factual predicate. In giving its ruling, the trial court stated:
"All of us are subject to victimization. *** [T]he fact that [defendant] may be victimized-the prison isn't any different than our society . I can walk in the street and be shot down by some deranged person or by some person who just doesn't like me. All of us can be assaulted out in the community.
"Our-our system says that the people who are in charge of housing the people that we incarcerate are to protect them. We know that can't be done because we know people are killed in prison and assaulted in prison just like they are killed *349 and assaulted outside of prison. So, there's no guarantee that anybody is going to be safe at any time."
(Emphasis added.)
Oregon's constitutional test for affirmance despite error-what we colloquially call "harmless error"-consists of "a single inquiry:" Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003). In this case, for defendant to have prevailed below required the trial court to accept that defendant was at an increased risk of victimization, and the trial court did not find that fact credible.[3] We cannot conclude that the trial court's refusal to consider an argument based on a rejected necessary factual predicate likely affected the verdict in this case.
With respect to defendant's federal constitutional argument, the test for harm differs. See, e.g. , State v. Bray , 342 Or. 711, 725, 160 P.3d 983 (2007) ("A violation of a defendant's federal constitutional right is harmless only when a 'reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a *874 reasonable doubt.' Delaware v. Van Arsdall , 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L.Ed. 2d 674 (1986) (describing the test announced in Chapman v. California , 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed. 2d 705 (1967) )"). However, before us, defendant did not respond to the state's harmless error argument at all, let alone articulate how the result might differ under the federal harmless error test as opposed to the state test. In light of the factual determinations made by the trial court, we conclude that the issue is harmless under both the state and federal standards.
Accordingly, we leave for another day the issue of whether consideration of the severity of a sentence for an intellectually disabled defendant requires consideration of that defendant's qualitative experiences while incarcerated.
Affirmed.

Defendant raises a second and separate argument that the trial court erred in its proportionality analysis by failing to consider the availability of treatment options outside of prison. How, if at all, treatment availability factors into the proportionality analysis is a question expressly left open by the Oregon Supreme Court in Ryan :
"We briefly turn to defendant's more particularized treatment-based argument. Before the Court of Appeals, defendant argued that the trial court erred in failing to consider evidence of 'an available treatment option that would be more effective and appropriate because of defendant's condition,' but defendant did not explain how that argument comported with the Rodriguez/Buck framework. Later, as noted, in his opening brief before this court defendant argued that the availability of rehabilitative treatment as part of an alternative sentence was relevant to the gravity of his offense, but he has not sufficiently explained how that argument comports with the Rodriguez/Buck framework to permit a carefully considered analysis of it. Accordingly, we decline to address it, and we express no opinion as to whether and, if so, how consideration of treatment options for an intellectually disabled offender as part of an alternative sentence could be relevant to a proportionality challenge under Article I, section 16."
361 Or. at 622-23, 396 P.3d 867 (footnote omitted).
We decline to reach that argument on preservation grounds. During the sentencing hearing, the trial court articulated its understanding of proportionality and indicated that would approach the question first by considering whether the 75-month mandatory minimum sentence was constitutional. As it explained, only if the court found that the mandatory minimum sentence was inapplicable because it shocked the conscience could it then consider whether to impose optional probation under the guidelines. And only in making that latter determination could the court consider the availability of a bed in a residential treatment home for intellectually disabled sex offenders. Defendant did not object to that analytical framework, or otherwise alert the trial court that treatment availability was a necessary component to the constitutional proportionality determination.

The nature of the Eighth Amendment's proportionality protections has been a subject of considerable debate. In Solem v. Helm , 463 U.S. 277, 284, 103 S. Ct. 3001, 77 L.Ed. 2d 637 (1983), the United States Supreme Court held that the cruel and unusual punishment clause of the Eighth Amendment prohibits "not only barbaric punishments, but also sentences that are disproportionate to the crime committed." Solem announced a proportionality analysis similar to Oregon's Rodriguez/Buck factors for reviewing a cruel and unusual punishment claim: (1) the gravity of the offense and the harshness of the penalty; (2) a comparison of the sentence imposed for more serious crimes in the same jurisdiction; and (3) a comparison of the sentences imposed for the same crime in other jurisdictions. Solem , 463 U.S. at 290-92, 103 S.Ct. 3001.
The Solem decision was later called into doubt by Harmelin v. Michigan , 501 U.S. 957, 111 S. Ct. 2680, 115 L.Ed. 2d 836 (1991). There, two justices concluded that the Eighth Amendment contains no proportionality guarantee (id. at 965, 111 S. Ct. 2680 (opinion of Scalia, J., joined by Rehnquist, C. J.)), and three other justices concluded that the amendment forbids only those sentences that are " 'grossly disproportionate' to the crime" (id. at 1001, 111 S. Ct. 2680 (Kennedy, J., concurring)). Even those justices recognizing a guarantee of proportionality review stressed that outside the context of capital punishment, successful challenges to particular sentences are "exceedingly rare" because of the "relative lack of objective standards concerning terms of imprisonment." Id .

Defendant does not argue that the record contains no evidence from which the trial court could make that factual determination, and we express no opinion on that factual determination by the trial court.