Argued and submitted March 16, 2017, affirmed October 16, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WENONA ROSSITER,
*Defendant-Appellant.*

Linn County Circuit Court
13CR06277; A158920

453 P3d 562

A jury found defendant guilty of first-degree manslaughter, ORS 163.118 (1)(c), for failing to seek medical treatment for her daughter, who died of diabetic ketoacidosis. At trial, the court admitted expert testimony indicating that defendant's failure to seek medical treatment for her daughter was a gross deviation from the applicable standard of care. The court also admitted evidence that defendant's religion proscribed seeking conventional medical treatment. On appeal, defendant assigns error to the trial court's (1) admission of the expert testimony, (2) admission of evidence of defendant's religion, and (3) imposition of the statutorily mandated 120-month sentence for manslaughter, which defendant contends is unconstitutionally disproportionate as applied to her under Article I, section 16, of the Oregon Constitution. *Held*: Defendant's challenge to the court's admission of expert testimony was not preserved, and any error was not plain under *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). The court was within its discretion under OEC 403 to admit evidence of defendant's religious beliefs, and it did not err in rejecting defendant's proportionality challenge to her statutorily mandated sentence.

Affirmed.

Daniel R. Murphy, Judge.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent. Also on the answering brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General. On the supplemental brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jennifer S. Lloyd, Assistant Attorney General.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Wilson, Senior Judge.

LAGESEN, J.

Affirmed.

Ortega, P. J., dissenting.

**LAGESEN, J.**

Defendant's 12-year-old daughter, S, died from untreated diabetic ketoacidosis. For not seeking medical treatment for S, defendant and her husband, S's father, were charged with first-degree manslaughter. After a joint trial, a jury found them both guilty.[1] On appeal, defendant assigns error to (1) the trial court's admission of testimony from the state's three expert witnesses generally to the effect that the failure to seek medical care under the circumstances was either a negligent or a gross deviation from the standard of care applicable to a parent or caregiver in defendant's position; (2) the court's admission of evidence, over defendant's OEC 403 objection, that as part of her religion, defendant avoided conventional medicine and looked to God to heal the body; and (3) the court's imposition of the statutorily mandated 120-month sentence for manslaughter, which defendant contends is unconstitutionally disproportionate as applied to her, in violation of Article I, section 16, of the Oregon Constitution.[2]

We conclude that (1) defendant's challenge to the admission of the expert testimony is not preserved and that the trial court did not plainly err in admitting the evidence; (2) the court was within its discretion under OEC 403 to admit evidence of defendant's religious beliefs; and (3) the court did not err in rejecting defendant's proportionality challenge to her sentence. Accordingly, we affirm.

## I. BACKGROUND

The facts relevant to the issues before us are few.

After S died, an autopsy revealed that she suffered from Type I diabetes and that diabetic ketoacidosis caused her death. At the time of her death, S had been sick

---

[1] Defendant and her husband were also each charged with second-degree manslaughter, a charge on which the jury returned a guilty verdict. That verdict merged with the verdict on the first-degree manslaughter charge.

[2] Defendant raises two additional assignments of error relating to the non-unanimous jury verdict in this case. Defendant contends that the Sixth and Fourteenth Amendments to the United States Constitution require unanimous jury verdicts for the charges in this case. We reject those assignments of error on the merits without further discussion. *See State v. Gerig*, 297 Or App 884, 886 n 2, 444 P3d 1145 (2019) (taking that approach).

for more than a month. She missed school for most of that time and lost a significant amount of weight. In the days and hours before her death, her symptoms intensified. The day of her death, she was uncommunicative and so weak that she could not walk to the bathroom on her own. At one point, while in the bathroom, she fell. She was vomiting and "peed everything she *** drank" and "wasn't really making sense" when she did try to speak. At no point did defendant or her husband seek medical care for S. Had they done so even shortly before her death, S's death likely could have been prevented. The test for diabetic ketoacidosis takes just a few minutes, and the condition is highly treatable even in an advanced state.

For their failure to seek medical treatment for S, the state charged defendant and her husband each with one count of first-degree manslaughter, ORS 163.118(1)(c), and one count of second-degree manslaughter, ORS 163.125 (1)(c). The state's theory of the case was that the risk of death to S absent medical treatment was or should have been apparent to both parents, that the failure to seek medical treatment caused S's death, and that both parents acted either recklessly (making S's death first-degree manslaughter) or with criminal negligence (making S's death second-degree manslaughter) in disregarding the risk that S would die if they did not seek medical treatment for her. Defendant and her husband disputed that they were reckless or negligent in failing to seek medical care for S. They contended that they reasonably believed that S was suffering from the flu—other members of the family had come down with it around the same time—and that they had no reason to think that medical treatment was required to prevent S from dying.

Before trial, defendant moved under OEC 401 and OEC 403 to preclude the state from introducing evidence of her religious beliefs. Defendant and her husband are members of the General Assembly and Church of the First Born. As part of their religious beliefs, they avoid conventional medicine and look to God to heal the body. It is counter to their religious beliefs to take a child to a doctor, and defendant would not do so unless a child asked to be taken to

the doctor. She argued that the evidence was not relevant and would be unfairly prejudicial. Opposing the motion, the state argued that the evidence was probative of motive— that is, that it would support an inference that defendant had an affirmative reason to not seek medical care for S, undercutting her claim that she thought that S was merely suffering from the flu. The state further argued that the risk of unfair prejudice did not substantially outweigh the probative value of the evidence on the point of motive. The trial court agreed with the state and ruled that the evidence was admissible:

> "It is not properly the court's role to second guess the parties' trial strategy but this is an unusual one indeed. Absent any evidence of the defendant's religious convictions or their relevance to the defendant's conduct in this case the state's case is reduced to two parents whose child becomes gravely ill, they take no action to provide medical care for the child for no discernible reason, and the child dies as a result. It would seem that this would be far more prejudicial to the defense than an explanation that they elected not to provide allopathic medical care out of religious conviction. Absent any evidence of the parents' religious conviction[,] their actions appear not only reckless but wanton and grossly reckless.

> "This court cannot find that evidence of a religious motive is more prejudicial in this case than the absence of such evidence. The probative value depends on what the evidence would indicate. If the evidence supported the conclusion that defendants' religious beliefs compelled them to the conduct in this case that occurred th[e]n it serves as a form of motive evidence and is probative and relevant. Under the OEC 401/403 analysis it is probative and not highly prejudicial.

> "Therefore, if offered to show that defendants acted in conformance with a religious directive or belief such evidence is admissible."

At trial, in accordance with the court's ruling, the state introduced evidence regarding defendant's religious beliefs about relying on God rather than conventional medicine, and that, consistent with those beliefs, she would not seek medical treatment for a child unless the child asked.

The state also called three medical experts at trial: Dr. Goby, a general practitioner who served as the county medical examiner and who had examined S's body at the family home the day S died; Dr. Nelson, the deputy state medical examiner who performed S's autopsy; and Dr. Nicol, a board-certified pediatric endocrinologist. All three testified about the progression of untreated diabetic ketoacidosis. According to their testimony, the early signs of the condition might be mistaken for flu-like illness. However, all three agreed that, in the hours leading up to S's death, her symptoms would have manifested as a medical emergency. Goby testified that her condition would appear to be an "emergency" and "dire," but that she likely would have survived if she had received medical treatment in the hour before her death. Nelson testified that the symptoms of the condition would be "obvious" and would appear to be a medical emergency to a layperson. Nicol testified that a person in the advanced stages of diabetic ketoacidosis would look "gravely ill" and "appear to be experiencing a medical emergency."

The state also elicited testimony from each expert that a parent or caregiver's failure to seek medical care for a child suffering from the symptoms of advanced diabetic ketoacidosis deviated from the standard of care for someone in that role, as well as testimony from Goby that a parent's failure to seek medical care for a child exhibiting the symptoms of advanced diabetic ketoacidosis would create a substantial risk of death to the child.

The state asked Goby:

> "Do you feel that based on the symptoms that would have manifested or based on the appearance of the body as you saw it or what you learned from that, that not taking this child for medical care, seeking medical help, was negligent?"

Goby responded, "[y]es." Defendant did not object to the admission of the testimony. Shortly thereafter, the state posed a similar question to Goby:

> "So I want to go back and sort of home in a little closer on the last question I asked before we took a break. And ask if a child exhibits some of the symptoms that you listed

like labored breathing, the shallow eyes, vomiting, the thirst, the weakness, lethargy, if they exhibit all of those things collectively together or over a certain period of time, say many hours, is it your opinion that a conscious failure to seek medical care by a parent who can see these things would create a substantial risk to a child?"

Defendant objected on the ground that the question sought testimony on "the ultimate issue in the case." The state responded that such testimony was authorized under OEC 704, which provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The court asked if the parties had "[a]nything further on the objection" and, hearing nothing, overruled it. Goby testified that the failure to seek medical care would create a substantial risk of death to a child.

When Nelson was on the stand, the state asked:

"If a child, a child, any child, presented with those symptoms to their parent, would it constitute a gross deviation from the standard of care for that parent to not take the child?"

Nelson responded, "[y]es." Defendant did not object.

Finally, when examining Nicol, the state inquired:

"Can you also testify that in a situation like that had that child been accompanied by adults, caretakers, parents, that failure to obtain medical care would have constituted a gross deviation from the standard of care you would expect from a reasonable person?"

Defendant objected:

"I am going to object to that question. The issue is what someone would observe and his question was if accompanied by adults, caretakers, etcetera, doesn't really address the issue of how long someone would be with that child, whether they would be there the whole day, whether they would observe the child the whole day, whether the child was sleeping or conscious. And I think because it's so vague and so crucial to the case I'm going to object on that basis."

The trial court overruled the objection, and the state posed the question to Nicol again:

"You may answer that question, would it constitute a gross deviation from the standard of care that you would expect from a reasonable person in that situation?"

Nicol responded, "[y]es."

The jury returned guilty verdicts on both charges against defendant. Those verdicts merged into a single conviction for first-degree manslaughter. The trial court sentenced defendant to the applicable mandatory 120-month sentence under ORS 137.700(2)(a)(D). In so doing, the court rejected defendant's argument that the mandatory sentence, as applied to defendant, was unconstitutionally disproportionate under Article I, section 16. Although the court concluded that the sentence was "harsh in this instance and under these facts," the court determined that it was not "so harsh as to shock the consci[ence]." Elaborating on its decision, the court explained:

"There is not enough difference from a more typical manslaughter case to distinguish it sufficiently to render the Measure 11 sentence so unjust as to violate the constitution.

"The Measure 11 sentence required in this case is not the best possible sentence the court could impose and if the court had discretion to formulate a sentence that was more just and more likely to protect the public, and in particular children, the court would do so. Absent a clear constitutional disproportionality the court does not have that discretion under Measure 11."

The court memorialized that ruling in its written judgment.

Defendant appealed. In her first four assignments of error, defendant challenges the trial court's admission of the testimony by Goby, Nelson, and Nicol that is set forth above. Defendant contends generally that the expert testimony at issue was admitted in violation of OEC 702, OEC 703, and OEC 403. The state responds that defendant did not preserve the issues that she is raising on appeal because she never objected on the grounds that the evidence was inadmissible under those particular rules. The state argues further that any error in admitting the challenged evidence is not plain.

In her fifth assignment of error, defendant assigns error to the trial court's admission of the evidence regarding her religious beliefs, contending that the court abused its discretion under OEC 403 in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The state responds that the court's decision was within its discretion, pointing to other cases upholding the admission of similar evidence under OEC 403.

Finally, in her sixth assignment of error, defendant contends that the trial court erred in rejecting her as-applied proportionality challenge to the 120-month sentence that the trial court imposed pursuant to ORS 137.700(2)(a)(D). The state responds that the court was correct to conclude that this case does not present the sort of "rare circumstances" in which Article I, section 16, requires a court to override the legislature's policy judgment as to the appropriate penalty for the crime of first-degree manslaughter.

## II.   ANALYSIS

### A.   *Expert Testimony*

Defendant's first four assignments of error challenge the trial court's admission of expert testimony from Goby, Nelson, and Nicol. But those assignments of error have not been presented in a way that facilitates meaningful appellate review, are not preserved, and, to the extent plain error review might be appropriate, do not demonstrate plain error.

We start with presentation. It is difficult for us to review these assignments of error in a manner consistent with the principle that "it is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself." *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003). That is largely because the assignments are presented to us in way that only loosely complies with ORAP 5.45.

The gravamen of defendant's assignments of error is that the trial court admitted four distinct pieces of testimony in violation of one or more specific rules of evidence: OEC 702; OEC 703; OEC 403. Rather than developing each assignment of error separately, she has combined them without meaningfully addressing the distinctions between the individual items of evidence or the individual rules as applied to particular items of evidence.

Although defendant generally contends that the assigned errors are preserved, and includes a preservation section in her brief, the content of that section does not demonstrate that defendant ever argued to the trial court that the admission of any of the challenged evidence violated any of those rules, as is required by ORAP 5.45(1) (2015).[3] Instead, the preservation section indicates that defendant objected to some but not all of the challenged testimony, and that her objections below do not match her objections on appeal.

At the close of the preservation section, defendant does acknowledge the possibility that her assignments of error are not preserved and requests plain error review if we conclude that is the case. However, her arguments as to why plain error review might be appropriate are cursory and her ensuing arguments on the merits do not frame the legal discussion in terms of the well-defined standards for plain error review under *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991).

Defendant's brief also does not address the standards of review applicable to evidentiary rulings under the OEC provisions identified. That conflicts with ORAP 5.45(5). It also imposes an additional impediment to our review. ORAP 5.45(5) provides: "Under the subheading 'Standard of Review,' each assignment of error shall identify the applicable standard or standards of review, supported by citation to

_____

[3] Defendant's opening brief was filed while ORAP 5.45 (2015) was in effect and is thus governed by that version of the rule, which has been amended since defendant filed her brief. ORAP 1.10(1). All references to the ORAP provision in this opinion are to the 2015 version of the rules. ORAP 5.45(4) provides, in pertinent part, that, in the section of a brief addressing preservation of error, "[e]ach assignment of error must set out pertinent quotations of the record where the question or issue was raised and the challenged ruling was made[.]"

the statute, case law, or other legal authority for each standard of review." As we have observed, "[t]he requirement that parties to an appeal set out the proper standard of review for each assignment of error is not a mere formality." *Dillard and Dillard*, 179 Or App 24, 26 n 1, 39 P3d 230, *rev den*, 334 Or 491 (2002). This court's fundamental function is to *review* the decisions of trial courts and administrative agencies, and the standard of review defines our role on review. The requirement that the parties to an appeal identify the standard of review applicable to a certain assignment of error "serves the purpose of causing the parties to frame their arguments appropriately to the types of rulings being challenged. It also helps to identify any differences that the parties may have regarding the proper scope of review[.]" *State v. Schwartz*, 173 Or App 301, 305 n 2, 21 P3d 1128 (2001). In other words, defendant's failure to identify the standard of review applicable to the challenged rulings, and to analyze the assignments of error through that lens, is a significant omission in her arguments to us.

Finally, defendant's argument on the merits consists of (1) a general summary of her view of the principles captured by OEC 702, OEC 703, and OEC 403,[4] and (2) a very general argument that the admission of the challenged evidence violated those principles. In the end, what we are presented with is a highly generalized argument that the admission of the evidence violated "the Oregon Evidence Code," without much regard to whether defendant preserved those issues, what this court's proper role is in reviewing the trial court's ostensible rulings, or much guidance about how the particular rules apply to the distinct items of evidence. Reviewing defendant's claims of error in view of that approach would place us in the position of developing defendant's arguments for her, at least to a fair extent.

To the extent that defendant's assignments of error have been properly presented to us, they are not preserved, and, as we explain, defendant has not demonstrated that the criteria for plain error review are present. For an alleged error to qualify as "plain," so as to permit plain error review,

---

[4] Defendant also identifies OEC 401 and OEC 704, but does not appear to base her argument on those rules.

it must (1) be a legal error that is (2) "obvious, not reasonably in dispute[,]" and (3) "appear 'on the face of the record,' *i.e.*, the reviewing court must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable." *Ailes*, 312 Or at 381-82 (quoting *State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990)).

Defendant first contends that Goby's testimony that defendant was "negligent" for not obtaining medical care for S "is an unhelpful legal conclusion drawn by a witness with no superior ability to apply the facts to the law than the jury." Assuming that that assertion could establish grounds for excluding evidence under one or more of the evidentiary rules cited by defendant, defendant has not demonstrated that it is "plain" either that Goby's testimony was "unhelpful" or that Goby had no superior ability to the jury's to assess whether defendant was negligent.

As for helpfulness, the Supreme Court has explained:

"There are situations * * * where a jury clearly is not equally well qualified and needs help to find the truth. There are also situations where a jury clearly is equally qualified without help from opinion testimony such as offered here. It is the area between the clearly qualified and the clearly unqualified where the trial judge should be granted a certain latitude of decision in excluding or receiving expert opinion testimony."

*Yundt v. D & D Bowl, Inc.*, 259 Or 247, 259, 486 P2d 553 (1971). In such circumstances involving a factual issue that is "neither clearly within, nor beyond, the jury's assumed level of understanding," a trial court has discretion in determining whether particular testimony will assist the jury in some way. *State v. Jesse*, 360 Or 584, 599, 385 P3d 1063 (2016). A trial court may admit expert testimony specifically addressing an issue to be decided by the jury so long as the issue is one that is not "clearly" within the jury's understanding. *Madrid v. Robinson*, 324 Or 561, 567-68, 931 P2d 791 (1997).

*Madrid* illustrates the point. It involved a negligence claim by the plaintiff, a guardian *ad litem* for a runner who was struck by the defendant's car while running along

a highway. *Id*. at 563. The runner's position in the roadway was disputed at trial. *Id*. Over the plaintiff's objection, the trial court permitted two accident reconstruction experts to opine that the runner had been in the travel portion of the roadway, and that the runner's position was the cause of the accident. *Id*. at 564-66. The jury found in favor of the defendant. *Id*. at 566. On appeal, we reversed. We reasoned:

> "At trial, the point of impact between [the runner] and defendant's car was a hotly contested factual issue. Although [the accident reconstruction experts'] testimony about the point of impact was cumulative, their testimony as to the cause of the accident was pure opinion on the legal consequences of disputed facts. *** That testimony impermissibly told the jury that it should reach a particular result on the question of defendant's alleged negligence."

*Madrid v. Robinson*, 138 Or App 130, 134, 906 P2d 855 (1995) (internal quotation marks and citations omitted).

The Supreme Court saw things differently. It concluded that it was a discretionary call for the trial court whether the testimony would be helpful to the jury under the circumstances. The court explained:

> "In this case, plaintiff argues that the officers' expert testimony about what 'caused' the accident should have been excluded, because it did not assist the jury to understand the evidence or a fact in issue but, instead, it merely told the jury to decide the case for defendant. The trial court reasonably could have sustained plaintiff's objections on those grounds. However, testimony about causation may refer to a question of fact that is properly within the realm of expert opinion, where the expert's evaluation and interpretation of evidence will assist the jury to understand it. Thus, the court reasonably could have found that the officers' opinion testimony addressed a fact in issue, *i.e.*, the point of impact, in a way that would assist the jury."

*Madrid*, 324 Or at 568.

Here, similar as in *Madrid*, knowledge of how a parent or other caregiver might respond to the signs of diabetic ketoacidosis in a child is not something that is clearly within the assumed understanding of the jury—at least,

in view of our plain error standards, it is not obvious that that is the case. Consequently, it is not obvious that Goby's testimony could not help the jury by "adding specialized confirmation and, thus, confidence to general propositions otherwise likely to be assumed more tentatively by the trier [of fact]." *Jesse*, 360 Or at 594 (identifying some of the ways that expert testimony can assist a jury). It therefore is not obvious that the trial court erred by admitting it.

As for whether Goby had no more of a "superior ability" than the jury to evaluate whether defendant's conduct was negligent, that also is not plain on this record. Goby had been a family practitioner for 43 years and had treated children with diabetes. That would permit a reasonable inference that Goby has developed expertise over time on what sorts of symptoms typically result in parents and caregivers seeking medical treatment for a child in their care. In any event, definitively resolving the question of Goby's competency to testify to whether a parent's failure to seek medical care for a child comports with the standard of care for a caregiver would require us to go outside the record created in the trial, which is something we cannot do in the context of plain error review. *Ailes*, 312 Or at 381-82.

Defendant next argues that the trial court erred in permitting Goby to testify that a conscious failure to seek medical care created a substantial risk of death. Although defendant characterizes that testimony as "less problematic" than Goby's opinion on negligence, defendant asserts that "the doctor essentially testified that defendant's disregard of the risk was negligent and the reason it was negligent is because it created a substantial risk" of S's death. Thus, defendant contends, the admission of the testimony "violated the above-described rules of evidence."

That argument does not demonstrate any plain error. Again, knowledge about diabetic ketoacidosis, the risks that it poses, and the circumstances under which a reasonable caregiver ordinarily would seek medical treatment for a child suffering from complications from Type I diabetes, is not obviously something that is "clearly" within a jury's assumed understanding, such that a trial court would have no choice but to exclude expert opinion on the point.

Defendant's final argument is as follows:

> "Lastly, both Doctors Nelson and Nicol specifically tes-
> tified that the failure to take a child who is suffering from
> the symptoms of DKA to the doctor constitutes a gross
> deviation from the standard of care that a reasonable per-
> son would observe—an express element of first-degree
> manslaughter. As repeatedly noted above, the doctors pro-
> vided no insight uncommon to the jury that would help it
> resolve that question—yet their credentials and positions
> of authority carried with them an unacceptably high risk
> that the jury would defer to their assessments."

Assuming again that the points made in that argument
could supply a basis for excluding the challenged evidence
under the identified evidentiary rules, it does not demon-
strate plain error for the same reasons identified in our dis-
cussion of Goby's testimony. Beyond that, it is not plain that
Nicol or Nelson had no helpful insights to supply. Nicol, in
particular, regularly treats children ages 0 to 18 for diabe-
tes. She testified, without objection, that children who are
ultimately diagnosed with Type I diabetes are typically
brought to a pediatrician "because their child has lost weight
or they are drinking or peeing all the time." That testimony
would support the inference that Nicol's experience as a
pediatric endocrinologist puts her in a position to observe
the circumstances that cause typical parents and caregivers
to seek medical care for children. That is information that
could help a jury evaluate how defendant's conduct comports
with what is reasonable to expect of a parent in similar cir-
cumstances. Although it is less evident on this record that
Nelson, a forensic pathologist, was in a position to supply
insight to the jury on the circumstances in which parents
and caregivers seek care for diabetic children, definitively
resolving that question would require us to go outside the
record, contrary to the rules of plain error review.

For those reasons, we reject defendant's first four
assignments of error.

B.  *Evidence of Religious Beliefs*

Defendant next assigns error to the trial court's
admission of evidence of her religious beliefs. She contends
that the court's reasoning in its letter opinion demonstrates

that the court erred in concluding that the evidence was admissible under OEC 403. Specifically, she contends that the court erred in its assessment of the state's need for the evidence and also in its assessment of the potential for unfair prejudice presented by the evidence.

We review a trial court's OEC 403 decision for abuse of discretion. *State v. Schmidt*, 296 Or App 363, 366, 439 P3d 500, *rev den*, 364 Or 849 (2019). "Generally, we defer to a trial court's 'decision whether the probative value of the evidence is substantially outweighed by the potential for prejudice.'" *Id*. (quoting *State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006, *cert den*, 506 US 858 (1992)).

Under that deferential standard of review, we will not displace the trial court's determination that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. The Supreme Court has held that evidence of a defendant's religious beliefs is admissible to prove motive when it is reasonable to infer that those beliefs operated as a motive to commit the charged crime. *State v. Brumwell*, 350 Or 93, 107-09, 249 P3d 965 (2011); *State v. Hayward*, 327 Or 397, 406-09, 963 P2d 667 (1998). In this case, a disputed issue on the manslaughter charge was whether defendant had consciously disregarded the risk of failing to seek medical care for S. Defendant's theory was that she had no reason to think that S's situation was so dire; the state's theory was that defendant was aware of the risk and consciously disregarded it. Under those circumstances, evidence that defendant's religious beliefs directed her to rely on God rather than on conventional medicine to heal the body was highly probative because it would support the reasonable inference that defendant had a motive for not seeking medical care for S, even though she was aware of the risk. We acknowledge, as does the state, that the introduction of evidence of a defendant's religious beliefs gives rise to a risk that hostility to those beliefs may influence a jury's deliberations. *See Brumwell*, 350 Or at 107 (recognizing the risk presented by evidence of religious beliefs, when those beliefs might be ones that jurors could view with hostility in view of their own religious beliefs). But, it was not outside the trial court's discretion to conclude that the probative

value of the evidence on the issue of motive was not substantially outweighed by the risk that the jury would decide the case based on hostility to defendant's religious beliefs. *See, e.g.*, *id*. (where evidence of the defendant's religious beliefs was "integrally related" to the reason the crimes were committed, trial court did not abuse its discretion by concluding that probable value was not substantially outweighed by the risk of unfair prejudice for purposes of OEC 403).

Defendant also argues that the trial court's remarks questioning defendant's strategic choice to seek to exclude the evidence demonstrates that the court misjudged how prejudicial the evidence could be. We do not disagree with defendant that the court's remarks can be read that way. Ultimately, though, it appears that the court's remarks were largely gratuitous. After opining on defendant's (and her husband's) trial strategy, the court went on to explain:

> "If the evidence supported the conclusion that defendants' religious beliefs compelled them to the conduct in this case that occurred th[e]n it serves as a form of motive evidence and is probative and relevant. Under the OEC 401/403 analysis it is probative and not highly prejudicial."

That explanation indicates that the trial court ultimately understood and ruled on the arguments presented to it about whether the evidence's probative value as motive evidence was substantially outweighed by the risk that the jury would decide the case based on improper hostility to defendant's religion. Therefore, notwithstanding its digression about defendant's trial strategy, we conclude that the trial court's decision to admit the evidence comported with OEC 403.

C.   *Proportionality*

Defendant's final contention is that the trial court erred when it rejected her as-applied proportionality challenge to the statutorily required 120-month sentence for manslaughter. Specifically, she asserts that the trial court erred in three respects: (1) by stating that it was not permitted to consider certain mitigating factors in assessing the proportionality of the sentence; (2) by finding the sentence to be proportionate, notwithstanding the fact that defendant

has no criminal history; and (3) by applying an incorrect legal standard in determining proportionality. None of those arguments demonstrates reversible error.

Starting with defendant's third point—whether the trial court applied the incorrect legal standard in assessing proportionality—that is of no moment in light of our standard of review. "In considering a sentence proportionality challenge under Article I, section 16, 'we review for legal error the trial court's conclusion that defendant's sentence was constitutional[.]'" *State v. Cook*, 297 Or App 862, 865, 445 P3d 343 (2019) (quoting *State v. Ryan*, 361 Or 602, 614, 396 P3d 867 (2017)). That is, we ourselves are required to assess the legal merits of defendant's proportionality challenge with fresh eyes, accepting any supported factual findings by the trial court. In so doing, we will apply the correct legal standard, even if the trial court applied an incorrect one. Defendant does not suggest that the trial court's ostensible application of an incorrect legal standard affected its factfinding or otherwise influenced its ruling in a way that would require a remand. As a result, defendant's argument that the court erroneously required her to show that the sentence was "clearly" disproportionate does not establish reversible error.

Defendant's first point fails to demonstrate reversible error because it is predicated on a misreading of the trial court's order. As the state points out, the court's "observations as to the limits of its authority to consider mitigating factors were directed at its authority under Measure 11, and not under Article I, section 16." Those observations about the scope of its authority under Measure 11 were legally correct. Under Measure 11, "the trial court has no discretion to impose a lesser sentence based on the specific facts of the case, harm to the victim, or characteristics of the defendant." *State v. Rodriguez/Buck*, 347 Or 46, 52, 217 P3d 659 (2009).

Finally, as to the merits of defendant's proportionality challenge, defendant has not demonstrated that this case is one of the rare ones in which Article I, section 16, permits a court to displace the legislatively prescribed sentence for the offense of which defendant was convicted.

*See State v. Wheeler*, 343 Or 652, 670, 175 P3d 438 (2007) (explaining that the standard for displacing a legislatively prescribed sentence under Article I, section 16, is one "that would find a penalty to be disproportionately severe for a particular offense only in rare circumstances"). The question, ultimately, is whether defendant's sentence can be said to "shock the moral sense" of reasonable people "as to what is right and proper under the circumstances." *Sustar v. County Court of Marion Co.*, 101 Or 657, 665, 201 P 445 (1921). Three factors inform the consideration of that question:

> "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."

*Rodriguez/Buck*, 347 Or at 58.

Considering those factors, defendant's sentence is not one that shocks the moral sense of reasonable people. The crime of which defendant was convicted was grave. The jury found that defendant caused her daughter's death by consciously disregarding a substantial risk that her daughter would die without medical treatment. As a result of defendant's conduct, as found by the jury, a child is dead because the people entrusted with her care did not seek medical care for her even though they were aware she faced a risk of death. The 120-month sentence is not overly severe for conduct causing the death of the child. The 120-month sentence also is in line with the sentences for other forms of homicide.[5] Although defendant's lack of criminal history weighs in her favor in this calculus, that fact ultimately does not convince us that this is one of the rare circumstances in which we may displace the legislatively prescribed penalty for defendant's offense, in view of the severity of the offense and the fact that the sentence is in line with the penalties for other forms of homicide. As the trial court recognized, defendant has not demonstrated that the circumstances of this case are so different from other cases of first-degree manslaughter that it would shock the conscience to require

---

[5] Under ORS 137.700(2)(a)(A), the mandatory minimum sentence for murder is 300 months. Under ORS 137.700(2)(a)(E), the mandatory minimum sentence for second-degree manslaughter, ORS 163.125, is 75 months.

defendant to serve the legislatively prescribed sentence, but not shock the conscience to require other defendants to do so, and defendant does not contend that the prescribed sentence is facially unconstitutional.[6]

Affirmed.

**ORTEGA, P. J.,** dissenting.

Although I agree with the majority that defendant's challenge to the admission of the expert testimony is not preserved, the trial court's admission of the testimony of Nelson and Nicol was plain error, in my view, and I would exercise discretion to correct that error. Because I would reverse on that basis, I dissent.[1]

I acknowledge at the outset that the error that I find to be plain is not plain to the majority. However, I remain convinced that the error is plain and that we should correct it under these circumstances. This case presented a challenge to the jury; a child is dead, and she died while in the care of a parent who, by all accounts, was an otherwise law-abiding person with whom the jury members otherwise might identify. The testimony whose admission was plain error relieved the jury of a burden that it was capable of bearing and was required to bear. It improperly gave the jury the backing of an expert to reach a decision that might well have been emotionally difficult to make otherwise. As I will explain, doing so was plainly erroneous and may well have allowed members of the jury to rely on the experts for a determination that they were required to make. For that reason, I would exercise discretion to correct that error.

I begin by setting some context. Consideration of an unpreserved claim of error encompasses two steps, the first being a determination of whether the trial court plainly erred. Error is "plain" if

---

[6] In her sentencing memorandum to the trial court, defendant argued that, among other things, the influence that her religious beliefs had on her conduct should bear on the proportionality analysis. Defendant has not further developed that argument on appeal.

[1] I agree with the majority that the court was within its discretion under OEC 403 to admit evidence of defendant's religious beliefs and that the court did not err in rejecting defendant's proportionality challenge to her sentence.

> "(1) the error is one of law, (2) the error is 'obvious, not reasonably in dispute,' and (3) the error 'appears on the face of the record,' so that we need not 'go outside the record to identify the error or choose between competing inferences, and the facts constituting the error are irrefutable.' *State v. Reyes-Camarena*, 330 Or 431, 435, 7 P3d 522 (2000) (internal quotation marks omitted)."

*State v. Corkill*, 262 Or App 543, 551, 325 P3d 796, *rev den*, 355 Or 751 (2014). If we determine that a trial court plainly erred, we consider whether we should exercise our discretion to correct that error. *State v. Vanornum*, 354 Or 614, 630, 317 P3d 889 (2013) ("That discretion entails making a prudential call that takes into account an array of considerations, such as the competing interests of the parties, the nature of the case, the gravity of the error, and the ends of justice in the particular case."). Because the asserted errors are legal ones and appear on the face of the record, plain error analysis in this case turns on whether the error is "obvious, not reasonably in dispute" and, if obvious, the prudential call of exercising our discretion to correct it. To explain why I see the error as plain and meriting the exercise of discretion to correct it, I begin with a discussion of the relevant elements of the crime of first- and second-degree manslaughter involving the death of a child under 14 years of age and when the death is caused by neglect or maltreatment.

In that circumstance, second-degree manslaughter requires the culpable mental state of criminal negligence, ORS 163.125(1)(c), and first-degree manslaughter requires the culpable mental state of recklessness, ORS 163.118 (1)(c).[2] Those terms are defined as follows. "Criminal negligence" or "criminally negligent"

> "means that a person fails to be aware of a substantial and unjustifiable risk that the result [the death of another

---

[2] For first-degree manslaughter not involving a child under age 14, the required mental state is "reckless[ness] under circumstances manifesting extreme indifference to the value of human life," ORS 163.118(1)(a), or intentional murder but mitigated by a defendant "under the influence of extreme emotional disturbance," ORS 163.118(1)(b). For second-degree manslaughter not involving a child under 14 years of age, the mental state is causing the death of another "recklessly," or "intentionally" when "caus[ing] or aid[ing] another person to commit suicide." ORS 163.125(a), (b).

person] *** will occur ***. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(10). "Recklessly"

"means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9). We have explained that the "difference between the two mental states is that a criminally negligent defendant grossly deviates from the standard of care for a reasonable person by *failing to be aware of a risk*, whereas a reckless defendant grossly deviates from the standard of care of a reasonable person by *consciously disregarding a known risk*." *State v. Clark*, 256 Or App 428, 435 n 6, 300 P3d 281 (2013) (emphases in original). A person charged with the crime of manslaughter that requires the mental state of recklessness or criminal negligence has, in both cases, a "duty to exercise that degree of care that a reasonably prudent person would use under the circumstances," and the disregard of a known risk or the failure to be aware of a risk must constitute a gross deviation from that degree of care. *Id.* at 435. Thus, a factfinder must assess, for both mental states, the degree of care required by a reasonable person in the given circumstances and assess whether the failure to be aware of the risk or the disregard of a known risk is a gross deviation from that standard.

Here, the state adduced evidence that the victim presented symptoms associated with advanced diabetic ketoacidosis, and the jury (if it believed that the victim presented those symptoms or some of them) had to decide whether defendant failed to be aware that the victim was at a substantial risk of dying (criminal negligence) or whether defendant knew that there was a substantial risk of the victim dying and disregarded that risk (recklessness). That assessment depended on a determination of whether a reasonable person responsible for a child faced with those

symptoms would seek medical help, the standard of care, and whether defendant's failure to seek medical help was a "gross deviation" from that standard of care. *Gross* deviation is the necessary degree of that failure, and it was the jury's task to decide whether that deviation was to such a degree that defendant's failure to seek medical help made her criminally responsible for the victim's death (rather than civilly responsible). *See State v. Lewis*, 352 Or 626, 641, 290 P3d 288 (2012) (stating that "the ordinary negligence standard of care *** provides the benchmark for determining whether the defendant's conduct was a 'gross deviation'"); *State v. Stringer*, 49 Or App 51, 55, 618 P2d 1309 (1980), *aff'd*, 291 Or 527, 633 P2d 770 (1981), *on reh'g*, 292 Or 388, 639 P2d 1264 (1982) (concluding that the trial court's instruction that the jury must find that the defendant's conduct constituted a gross deviation from the standard of reasonable care was the correct instruction because it "correctly informed the jury as to the degree of the breach of duty which was requisite to a finding of criminal liability under ORS 163.145").

I turn to the challenged testimony from Nelson and Nicol. Nelson, the forensic pathologist, testified to the symptoms of diabetic ketoacidosis and that they would be observable to a layperson and would manifest as an emergency and ultimately, that it would "*constitute a gross deviation from the standard of care* for that parent to not take [a] child" with those symptoms to a hospital. Nicol, the pediatric endocrinologist, likewise testified to the symptoms of diabetic ketoacidosis and that the failure to seek medical care would "*constitute a gross deviation from the standard of care* that you would expect from a reasonable person in that situation[.]"

I agree with the majority that the two doctors could assist the jury in understanding the symptoms of diabetic ketoacidosis and that Nicol could assist the jury in understanding the typical response she sees from caregivers who encounter such symptoms in their children. Such testimony was outside the jury's expertise and could help the jury perform its task of determining the standard of care. But in proceeding to opine that it *was a gross deviation* from the standard of care for a parent (or other responsible person) to not seek medical care when a child is presenting the symptoms

of diabetic ketoacidosis, Nelson and Nicol went too far: They opined that a person in defendant's situation deviated from the standard of care necessary (that is, if a person knew of the risk and disregarded it or should have known of the risk) to establish that the person was *criminally culpable* for a child's death. The doctors lacked specialized understanding or knowledge to make that assessment; they usurped the jury's task rather than assisting it.

The assessment of "gross deviation" requires a decision by the jury that involves an appraisal of the defendant's culpability based on qualitative factors that is outside the ambit of medical expertise. Indeed, that assessment requires an analysis of what an ordinary parent—that is, a parent without the benefit of medical training or experience—should have done; allowing an expert (no more qualified than the jury members) to make that determination for the jury is particularly unhelpful.

We have upheld the allowance of testimony as to complex matters outside the jury's expertise. *See, e.g.*, *State v. Nistler*, 268 Or App 470, 487, 342 P3d 1035 (2015) (allowing expert testimony as to the regulation of securities and whether the transaction at issue was part of a "common enterprise"). In *Nistler*, to determine whether the transactions at issue were securities, a four-element test for an investment contract had to be met, including whether the transaction was part of a "common enterprise," which in turn required "horizontal commonality." *Id.* at 483. As we explained, that factual finding which the jury was tasked with making was the "archetype" of a situation requiring "enlightenment from those having a specialized understanding of the subject involved in the dispute." *Id.* at 486 (quoting Legislative Commentary to OEC 702, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 702.02, 619 (6th ed 2013) (emphasis omitted)). Put another way, the expert's testimony in *Nistler* was helpful because the "regulation of securities is not within the purview of the 'untrained layman'—nor, for that matter, most legally trained professionals." *Id.* at 486.

In this case, however, the jury's task—finding that the deviation from a reasonable standard of care was enough

to constitute criminal negligence or recklessness—was neither complex nor outside of the purview of an "untrained layman." To be sure, the medical experts' testimony was helpful to establish how the victim died, how the symptoms of diabetic ketoacidosis would have presented, and that timely medical intervention would have prevented her death. However, the jury members were well-qualified by their life experiences, judgment, and ability to assess the evidence and to answer the question whether the failure to heed those exhibited symptoms was a gross deviation from the standard of care. In this instance, no "enlightenment" was needed to determine the issue of criminal culpability—and allowing the medical experts to opine on that issue suggested that medical expertise was necessary to resolve it and held the potential to improperly influence a determination that belonged to the jury alone.

Accordingly, I would conclude that the opinions of Nelson and Nicol were clearly unhelpful under OEC 702 and that their admission was an "obvious" error that is not "reasonably in dispute."

Before discussing why I would exercise *Ailes* discretion to correct the trial court's failure to disallow Nelson's and Nicol's challenged testimony, I address why I would conclude that their unhelpful testimony was not "otherwise admissible" as not unduly prejudicial under OEC 403. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 823 P2d 956 (1991). That evidence rule provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

Because defendant primarily relies on *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), to support her argument that the medical experts' testimony *was* unduly prejudicial, I turn to that decision.

In *Southard*, the Supreme Court decided whether a medical diagnosis of child sexual abuse is admissible scientific evidence when there is no physical evidence of sexual abuse. 347 Or at 129-31. To assess the probative value of the

medical diagnosis, the court first concluded that the diagnosis—based on procedures that included interviews, the child's history, and guidelines—was valid scientific evidence. *Id.* at 139. Despite the scientific validity of the evidence, the court, when deciding whether the trial court erred under OEC 403 by admitting the diagnosis, reasoned that, in

> "determining the probative value of the doctor's ultimate conclusion of sexual abuse, we note that her diagnosis did not tell the jury anything that it was not capable of determining on its own. As noted above, whether defendant caused the boy to engage in oral sex (and thus sexually abused him) does not present the sort of complex factual determination that a lay person cannot make as well as an expert."

*Id.* at 140. Because the record lacked physical evidence of abuse, the jury's finding of sexual abuse rested on credibility determinations, and "the doctor's diagnosis *** did not tell the jury anything that it was not equally capable of determining, the marginal value of the diagnosis was slight." *Id.* Further, the

> "risk of prejudice *** was great. The fact that the diagnosis came from a credentialed expert, surrounded by the hallmarks of the scientific method, created a substantial risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence.' *** [T]he diagnosis is particularly problematic because the diagnosis, which was based primarily on an assessment of the boy's credibility, posed the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible."

*Id.* at 140-41; *see id.* at 142 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 7:9, 810-13 (3d ed 2007) ("Where the issue and subject are ones lay jurors can appreciate and evaluate by applying common knowledge and good sense, admitting expert testimony seems the wrong thing to do and may warrant reversal if it is likely to dissuade the jury from exercising its own independent judgment or if it effectively takes over the jury's traditional function to judge the credibility of witnesses.").

Here, Nelson's and Nicol's challenged testimony had scant probative value. The jury was required to assess the degree of deviation from the standard of care to support a finding of recklessness or criminal negligence, and that assessment was one that did not require assistance from the medical experts. Nor were the medical experts helpful in that regard. Not unlike the encroachment in *Southard* on the jury's exclusive role in determining *credibility*, the challenged testimony in this case likewise "did not tell the jury anything that it was not capable of determining on its own." 347 Or at 140. That is, the degree of deviation from the standard of care was an assessment that the jurors could "'appreciate and evaluate by applying common knowledge and good sense.'" *Id*. at 142 (quoting Mueller and Kirkpatrick, 3 *Federal Evidence* § 7:9, 810-13). In this case, the jury was "equally capable" of assessing whether there was a gross deviation from the standard of care, and the testimony that encompassed that finding had little probative value.

As to unfair prejudice, the state finished its direct examinations of Nelson and Nicol by summarizing the symptoms associated with diabetic ketoacidosis and then asking whether the failure to seek medical care was a gross deviation from the standard of care expected from a reasonable person in defendant's situation. Because those final opinions as to the degree of deviation from the standard of care were significantly tied to testimony that had an "aura of reliability or validity," that connection created a "substantial risk that the jury may be overly impressed or prejudiced." Consequently, because I believe that the risk that the jury would defer to that testimony substantially outweighed its minimal probative value, I would conclude that it was unfairly prejudicial under OEC 403.

Finally, I address why I would exercise discretion to correct the trial court's failure to *sua sponte* exclude the challenged testimony. It is a longstanding principle that "only in rare and exceptional cases" will we "notice an alleged error where no ruling has been sought by the trial judge." *Hotelling v. Walther*, 174 Or 381, 385, 148 P2d 933 (1944). An appellate court's decision to exercise its discretion to address an unpreserved claim of error "should be made with utmost

caution" because "[s]uch action is contrary to the strong policies requiring preservation and raising of error." *Ailes*, 312 Or at 382. The *Ailes* court articulated the following factors as relevant to the exercise of plain-error discretion:

> "[I]n deciding whether to exercise its discretion to consider an error of law apparent on the face of the record, among the factors that a court may consider are: the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error. Those factors do not comprise a necessary or complete checklist; they merely are some of the permissible considerations."

*Id*. at 382 n 6 (citations omitted). Considering those factors, I would conclude that we should exercise our discretion to correct the errors in this case.

To begin with, the gravity of the errors and the ends of justice in this case weigh in favor of exercising discretion to correct, because the errors concerned the pivotal disputed issue. Defendant's position was that it was reasonable for her to believe that the victim was sick with the flu—a non-life-threatening illness that afflicted other family members and church members on the day the victim died. Nelson's and Nicol's opinions formed the core of the state's case that the victim died of diabetic ketoacidosis, that the symptoms of that condition would have appeared to a lay person as serious, and that, had defendant obtained medical care for the victim, she would have survived. From that testimony, the jurors could have arrived at the conclusion that defendant's failure to obtain medical care for the victim consciously disregarded or failed to be aware of the risk that the victim would die and was a "gross deviation from the standard of care that a reasonable person would observe in the situation." The prosecutor acknowledged that that particular issue was a "difficult" one, particularly in light of the circumstances of the case, which the prosecutor acknowledged as a "tragedy" and that he "honestly ***

believe[d defendants] were surprised when" their daughter died. Such testimony would have been in the realm of what is allowed under *Madrid v. Robinson*, 324 Or 561, 568, 931 P2d 791 (1997), relied on by the majority.

But here, the testimony ventured further into an area that was "clearly" within the jury's understanding and therefore improper. By opining that failing to recognize the risk that they had described amounted to a "gross deviation" from the standard of care, the medical experts provided an additional—potentially persuasive—basis which jurors could lean on to make that emotionally difficult assessment. *See State v. Ramirez*, 343 Or 505, 513, 173 P3d 817 (2007) (consideration of the likelihood that the error affected the outcome of the proceeding below for determination of the gravity of the error).[3]

That is especially true because Nelson's and Nicol's impermissible opinions were not ones that a juror was likely to overlook. Both opinions were offered at the conclusion of the medical experts' testimony on direct examination and were presented as a summary of their previous helpful and admissible testimony. Further, the effect of those opinions was magnified by the fact that the two medical experts agreed with each other by providing essentially identical conclusions. In such a case, it is unlikely that the opinions would have been easily dismissed by the jury.

I also would conclude that defendant's failure to preserve the arguments she raises on appeal was not a plausible tactic to advance her defense. *See State v. Fults*, 343 Or 515, 523, 173 P3d 822 (2007) (the "possibility that defendant made a strategic choice not to object" is a factor a court may consider). Defendant did make objections to the challenged opinion testimony, albeit on grounds other than the ones made on appeal, so defense counsel's failure to object on the grounds defendant now raises was not an attempt to avoid drawing attention to the opinions or emphasizing their significance. It is more plausible to conclude that counsel was

---

[3]   The first-degree manslaughter verdict was not unanimous, and an error "is more likely to be considered grave when the case is a close one, as reflected by a split jury verdict to convict." *State v. Inman*, 275 Or App 920, 959, 366 P3d 721 (2015) (Sercombe, J., dissenting).

either unaware of the correct arguments necessary to challenge that testimony or believed that the trial court would again overrule the "ultimate issue" objection.

For all of those reasons, I would conclude that Nelson's and Nicol's testimony was not "otherwise admissible" under OEC 702 because it was unhelpful expert opinion testimony and also unfairly prejudicial, and therefore that its admission constitutes an error apparent on the face of the record. I would exercise our discretion to correct the error, given its gravity.

Accordingly, I dissent.